CONEKIN v. LOCKWOOD.

(District Court, E. D. South Carolina. February 24, 1916.)

**1. SALVAGE ⬤⟿38—SUIT BETWEEN SALVORS FOR APPORTIONMENT OF AWARD.**

A suit in personam by the crew, or one member of the crew, of a salving vessel will lie against the master or owner, where the entire reward has been paid to the latter, or has otherwise come into his hands.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec. Dig. ⬤⟿38.]

**2. SEAMEN ⬤⟿7—SALVAGE—VALIDITY OF CONTRACT BY SEAMEN FOR FIXED SUM.**

A seaman is not bound by an agreement made in advance with the master or owner that he will accept one month's pay as his share in all cases of salvage, and especially under Rev. St. § 4535 (Comp. St. 1913, § 8324), which provides that "every stipulation by which any seaman consents to abandon * * * any right which he may have or obtain in the nature of salvage shall be wholly inoperative."

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 19–24; Dec. Dig. ⬤⟿7.]

**3. SALVAGE ⬤⟿38—APPORTIONMENT BETWEEN VESSEL AND CREW—DISCRETION OF COURT.**

There is no fixed rule with respect to the apportionment of a salvage reward between the owners of the salving vessel and her officers and crew, but the distribution rests in the discretion of the court, and is governed largely by the peculiar circumstances of each case.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec. Dig. ⬤⟿38.]

**4. SALVAGE ⬤⟿38—APPORTIONMENT—SHARE OF SEAMAN.**

The engineer of a tug, having a crew of five men besides the master, which rendered a salvage service to a burning steamship, for which the owner received the net sum of $18,939.30, *held* entitled to recover $823.40 as his share of the 20 per cent. apportioned to the master and crew.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec. Dig. ⬤⟿38.]

In Admiralty. Suit by Dawson Conekin against Ella Ann Lockwood. Decree for libelant.

J. P. K. Bryan and F. M. Bryan, both of Charleston, S. C., for libelant.

Alfred Huger, of Charleston, S. C., for respondent.

SMITH, District Judge. This is a proceeding in personam in admiralty, filed December 30, 1915, by one salvor against another for distribution. The answer has been filed and the issues made up and the testimony taken and the cause heard upon the merits.

[1] There is no doubt that a suit will lie in personam by the crew, or one member of the crew, against the master or the owner of a salving vessel, where the entire reward has been paid to the latter, or has otherwise come into his hands. The proceedings in the present case are brought on behalf of the engineer of the tug Cecilia against the owner of the tug Cecilia for the former's distributive share of the salvage, the entire amount of which has been received by the owner.

The facts of the case, as appearing from the admissions in the pleadings and from the testimony, are that a large steamship called the Colorado, with a cargo of cotton on board, was, on or about the 27th day of October, 1915, on fire and abandoned by the master and the crew so as to be derelict on the high seas off Cape Romain on the coast of South Carolina, 20 or 30 miles from the port of Charleston. The tug Cecilia of which the libelant was the engineer, and the steam tug Waban, both of Charleston, S. C., hearing of the condition of the steamship Colorado, proceeded up the coast in search of her, and found her in the position stated, viz., on fire and abandoned and derelict. The weather was fair and the sea comparatively smooth, and the Cecilia, upon reaching the Colorado, proceeded near enough to her to pump water upon her bow so as to cool off her stem, and after so doing for some time, the mate and deck hand of the Cecilia were sent from the Cecilia, and with the aid of a ladder ascended the stem of the Colorado, so cooled, and fastened a hawser to it, protecting the hawser by a mattress. In like manner when the Waban came up her hawser was also fastened to the stem of the Colorado, and the two tugs proceeded to tow the burning steamship into the harbor of Charleston, where she was beached upon a shoal and the tugs then proceeded to pump her full of water in order to extinguish the fire. After this was done, they then proceeded to pump her out, aided by the pumps of the Colorado through connections made from the Cecilia to the steam pumps of the Colorado, apparently from the testimony principally by the labor of this libelant, who was engineer of the Cecilia, which enabled those pumps to work and continue the pumping, so that the Colorado could be pumped out and towed to a wharf, where her cargo was removed and the process of salving the vessel and cotton completed. As the engineer of the Cecilia the libelant seems to have labored for several days, more or less, continuously in his duties as engineer, both with regard to the propelling machinery of the Cecilia, as well as her pumping machinery. Subsequently, after the salving of the vessel, the master of the tug Cecilia offered to each of his crew, about the 1st of November, 1915, as their share of the salvage, one month's extra pay, which in the case of the engineer was $100. This the libelant refused. Subsequently the claim of the two tugs for salvage was settled by the owner and underwriters of the hull, cargo, and freight of the steamship Colorado, for the sum of $47,500, which amount was paid about the 17th December, 1915, and thereafter, on the 29th December, 1915, this libelant having instituted, or threatened to institute, proceedings against the owner of the tug Cecilia for his share of the salvage, he was discharged from further employment on the Cecilia. At the time of the Cecilia's salving of the Colorado her crew consisted of six individuals, viz., the captain, R. H. Lockwood, who was the husband of the owner of the vessel and whose wages were $100 per month; the engineer, the libelant herein, whose wages were $100 per month; a mate, the son of the captain, whose wages were $30 per month; one deck hand, whose wages were $20 per month; one fireman, whose wages were $30 per month; and one cook, whose wages were $25 per month, making an aggregate

monthly pay roll of $310. The owner of the vessel who had received the entire proceeds of the cargo refused to make any greater payment to the libelant than the sum of $100, or one month's extra pay. The answer of the defendant pleads, by way of defense in bar, that the libelant, as engineer of the tug Cecilia, had made an agreement that in all cases of salvage, he was to receive, as one of the crew of the tug, an amount equal to one month's wage, that this amount was $100, which had been duly tendered to him, and that he had refused to accept it, and that under his contract he was barred from any right to recover more. It further sets up, as matter of defense, that the libelant's services had not been as continuous as claimed by libelant in the libel. The amount received by the tugs Cecilia and Waban for their salvage of the Colorado was, as before stated, $47,500, which presumably was divided equally between them, giving to each tug and its crew $23,750. The answer of the defendant admits receiving as salvage $18,939.30. The difference between that and the amount actually paid of $23,750 is not explained. Possibly it was swallowed up in lawyers' fees and other expenses; and, in the absence of explanation in the testimony, the amount of salvage actually received, net, by the respondent will be placed, as stated, at the sum of $18,939.30. Upon the plea in bar, interposed, of the existence of an agreement to receive one month's extra pay in full for all compensation in all salvage cases, the two questions arise whether or not there ever was such an agreement, and, next, if there were such an agreement, is it binding in a case of salvage? The evidence as to the existence of the agreement is conflicting; the libelant denies that any such agreement was ever entered into, and the master of the tugboat, the husband of the respondent, insists that there was. From the evidence it appears that the libelant was, at first, engaged to hold a permanent position of engineer of the Cecilia at $100 per month; nothing at that time being said as to any release of salvage or acceptance of any fixed sum in all cases as the equivalent of libelant's share in the salvage. After libelant's engagement, and after he went to work, there does appear to have been a conversation at which the master of the tug stated to him that his rule was, in cases of salvage, to allow only an extra month's wage. There appears to have been no formal acceptance of this other than the acquiescence of silence, and in one salvage case, to wit, the salvage earned upon a boat named the Orion, the libelant did accept the sum of $100 in full of his share of the salvage in that case, but without stating in his written acceptance that it was in pursuance of any agreement, or that it represented what he was to receive in other cases. On the whole, from the testimony, it would scarcely appear that there was any finally accepted agreement entered into by the libelant to receive a month's extra pay in all cases of salvage, irrespective of the circumstances of any particular case.

[2] However this may be, in the opinion of the court, an agreement of this kind is not binding upon a seaman under the rule in admiralty, unless the agreement is one which the court would enforce as being reasonable and equitable, free from oppression and duress, and fairly and clearly entered into without compulsion. That is the general rule

with regard to contracts for salvage between the salvor and the salved. There is no reason why it should not apply as between the salvors themselves when they hold the positions of master and seaman. The engineer is like any other seaman who is on board of a boat. It is his duty to obey the orders of the master. If the master sees fit to imperil his vessel and the lives of his employés on board in the effort to effect a salvage, the seaman's duty is to assist. Salvage is an allowance, not made by one salvor to another, but allowed by the court directly; it proceeds directly from the court to the salvor, and is for the purpose of stimulating voluntary effort to assist in the rescue of life and property from destruction at sea. To hold, therefore, that the seaman who may be called upon unexpectedly and against his will to risk his life and to undergo greatly enhanced and exhaustive labors for the purpose of accomplishing salvage may, in advance, and before those services are performed, contract away his reward would appear to be contrary to the policy of the law, and the court so holds. The owner and crew may agree as to a distribution, but an inequitable agreement will not be enforced (The Enchantress, Lush, 93), and an agreement before the services rendered is not binding (The Louisa, 2 W. Rob, 22). The statute law would appear to enforce this principle. Section 4535 of the United States Revised Statutes (Comp. St. 1913, § 8324) provides that every stipulation by which any seaman consents to abandon any right which he may have or obtain in the nature of salvage shall be inoperative.

[3] The defense set up in bar, therefore, in this case under the circumstances of the present case must fail, and the only remaining question is, what proportion of the salvage should be received by the libelant? There appears to be no fixed rule with respect to the apportionment of the salvage reward between the owners of the salving vessel and her officers and crew. The distribution in all cases of this kind is a matter resting in the discretion of the court, and is governed largely by the peculiar circumstances of each individual case. As salvage is a reward for the encouragement of voluntary promptness, energy, efficiency, and heroic endeavor in saving life and property in peril on the seas, the claims of the master and crew who evince these qualities and undergo the perils are regarded with the most favorable consideration. In the days of sailing vessels, as the salvage depended more upon the individual efforts of the salving crew than the efficiency of the salving vessel, the position of the crew was much more favorably regarded, and the larger part of the salvage award was generally apportioned to the officers and crew. The use of steam, however, has largely changed this. Under the general use of steam it is really the vessel which conduces most to the effectuation of the salvage result, and salvage is largely now considered from the standpoint of a sufficient reward to induce salvors to keep ready and in position steam vessels efficiently equipped with pumps, tackle, etc., to render salvage service. It is more difficult to procure that there are kept on hand steam vessels possessing motive power and salvage equipment in an efficient position to render salvage services than it is to find individuals who would use inefficient attempts. The proportions, therefore,

have varied so as to allow a much larger proportion to the owner of the vessel. So, too, the master upon whom the responsibility of the direction and the determination to make the effort exists is allowed frequently a larger proportionate share than the rest of the crew, although an exception is made in the case of such members of the crew as may show exceptional effort and merit in their services. Sometimes the engineer may be allowed more than the master. In a number of cases the salvage has been apportioned at one-fourth for the crew and three-fourths for the owners. There is, however, no fixed binding rule of apportionment, and it should depend upon the circumstances of each case. In the case at bar, while the danger to the derelict vessel salved was very great, there appears to have been little danger to the salving vessels or their crews. The crews did little more than what they would have done ordinarily in the discharge of their duties. The really efficient instruments in the salvage were the tugs which could proceed to the scene of disaster on the high seas, tow the burning vessel to a harborage and there by their pumping equipment extinguish the fire.

[4] Under all the circumstances of the case the court is of the opinion that 80 per cent., or $\frac{4}{5}$ of the salvage, should go to the owner of the vessel and $\frac{1}{5}$, or 20 per cent., should go to the crew, and 20 per cent. of the salvage amount of $18,939.30 would be $3,787.86. The rule frequently followed is that the salvage allowed the crew should be divided among them in proportion to wages, but this is not always the case. The master's share may be increased, and is sometimes twice what his proportion would be under wages, although it may be reduced for dereliction of duty. In the present case the mate and deck hand seem to have been the parties who actually made most exertion in nearest proximity to the burning ship. While no other members of the crew except the present libelant are making any question, still their shares must be considered in order to arrive at what amount should be properly allowed to the libelant. In the present case, under the circumstances, the captain's should be fixed at twice the amount represented by his monthly wage, or say $200; the engineer at the proportion of $100; the mate at the proportion of $60; the deck hand at the proportion of $40; the fireman at the proportion of $35; the cook at the proportion of $25—making a total of $460, as including the proportions in which the salvage allowed the crew should be shared, of which the engineer would receive ten forty-sixths, or $823.40, for which amount a decree on behalf of the libelant against the respondent may be entered in this case.