**SHIELDS et al. v. UNITED STATES.**

No. 197 of 1945.

District Court, E. D. Pennsylvania.
March 18, 1947.

Freedman, Landy & Lorry, of Philadelphia, Pa., for libellant.

Krusen, Evans and Shaw, of Philadelphia, Pa., for respondent.

KIRKPATRICK, District Judge.

The libellant joined the steamship "Hannibal Hamlin" as a member of the crew on September 18, 1944. At the time, longshoremen were engaged in loading cargo into the holds and the libellant was assigned to the duty of oiling the deck winches. On the morning of the third day of his employment, while he was oiling the port winch at No. 2 hatch, the machinery was prematurely started by the winch operator, an employee of the stevedore, and the libellant suffered injuries which resulted in the amputation of his left hand and a degree of permanent impairment of the right.

Two suits were instituted in his behalf (he being then a minor), one a suit at law against the stevedore, B. H. Sobelman & Co., and the other, the present suit, in admiralty, against the United States as owner and (through an agent) operator of the vessel. The Sobelman case came to trial first and, after the libellant's case was closed, a settlement was made by which the libellant received $30,000. The release contained an express provision that the settlement was without prejudice to his claim against the vessel, her owners and operators. The testimony in the Sobelman case (Shields v. Sobelman, D.C., 64 F.Supp. 619) has been, by stipulation, received as part of the evidence in this case.

The libel charges the respondent with negligence in starting the winch and with a number of other negligent acts and omissions, all of which are rather closely related to that act. Now, however, after the hearing, the libellant contends that the negligence consisted in (1) failing to instruct an inexperienced seaman, (2) supplying the libellant with a defective oil can, (3) providing a place to work which was unsafe by reason of the improper method of operating the winch adopted by the longshoremen.

Were it not for some reference to it in his brief, it would look as though libellant's counsel had abandoned the theory that the respondent is responsible for the negligence of the winchman. At any rate, the decision upon which he relies (Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099) does not support

the proposition. The Court in that case held that the policy of the law required that longshoremen, whose employment was essentially maritime and similar to that of seamen both in service rendered and in risks assumed, be accorded the traditional protections applied to seamen by admiralty in respect of seaworthiness of the vessel. There is no such practical need or policy which requires that the shipowner be held responsible for the negligence or misconduct of such longshoremen, not employed by him but by an independent contractor and doing work over which he has little if any control. Neither in the Sieracki case, supra, nor in any other has it been held that longshoremen are seamen for all purposes.

### Findings of Fact.

### 1. Instructions.

■ The libellant was a new hand but by no means a green one. He had received three months training at the Maritime Service Training School in the engine room course and had there been instructed in oiling deck winches like those on the Hamlin. He had made half a dozen voyages covering the period of a year, serving as an oiler on all of them. There had been no occasion for him to oil deck winches on those ships, which were tankers, but he had observed the oiling of such winches as they had. He was 20 years old and, judging by his appearance and testimony, an intelligent young man. He had spent the two days before the accident oiling the winches on the Hamlin and had probably performed the operation between 50 and 100 times. On the morning of the accident, the first assistant engineer stood by watching him while he oiled the starboard winch at the No. 2 hatch and observed that he did the work in a proper and satisfactory manner. He was, of course, entirely familiar with the construction of cargo winches and knew how they worked. There was no testimony as to how long it would take a man of Shields' training and experience as an oiler to learn all there was to know about oiling any particular type of winch, but one can hardly believe that more than an hour would be needed.

At no time did Shields ask for instructions. Nor did he at any point in his testimony assert that any lack of experience or ignorance of the operation of the winches or of the method of oiling them on his part was in any way responsible for his injury. As a matter of fact, he would not have been hurt had he not attempted to oil a bearing by thrusting his hand through an opening in the flywheel, and it would have been unnecessary and really absurd to have explained to a man of his experience and intelligence that that would be a dangerous thing to do and that his hand would be caught if the winch should start.

### 2. Oil can.

■ The oil can with which Shields was working had a broken spout which made it about three inches shorter than the ordinary type of can used for oiling the winches. Without regard to the question whether there is anything dangerously defective about such a can, the fact is that the shortened spout had nothing to do with the accident. The regular length oil can was too short, by five inches, to reach the bearing from outside the flywheel and if Shields had had one he still would have had to put his hand through the flywheel, so long as he chose to oil the bearing from the place where he attempted to do it.

### 3. Method and Place of Work.

The work of loading cargo was entirely in the hands of the stevedoring company, an independent contractor. The place where the work was being performed, however, was the deck of the vessel which was in the respondent's control with crew and officers on board.

■ An employer's duty to his own employees to see that the place where they work is safe is non-delegable—that is to say, it is in nowise affected by the fact that employees of an independent contractor are doing most of the work. Closely assimilated to the duty to furnish a safe place for his own employees to work, and not always distinguishable from it, is the duty to see to it that they are not subjected to danger in the course of their duties by reason of any improper or unsafe methods of carrying on the work by employees of the independent contractor. In most cases the result of such improper methods of work

is to create an unsafe place for the employer's own men to perform their work and hence the close interrelation of improper methods and unsafe place. In the present case they come very close to amounting to the same thing and need not be separately considered. Of course, the respondent could not control the manner in which the longshoremen did their work but it was under a duty not to assign its own employees to duties which the longshoremen's method made unsafe.

At No. 2 hatch there were two large cargo winches, one on each side of the deck. Each winch had its own separate control, or throttle, and each winch had a brake For reasons of convenience, or possibly of economy of manpower, the stevedore had rigged a pair of long wooden handles by means of which one man standing between the two winches could operate both, either simultaneously or separately. This arrangement, the libellant contends, led to an improper method of operation which made it dangerous for a man at work oiling the winches, because the winch operator, standing between the wooden handles, would not be likely to see him unless he turned his head. At the time of the accident the operator was not looking and did not see that Shields was working on the winch, and his starting the winch without warning was one of the two prime causes of the accident, the other being Shields' thrusting of his hand through the flywheel. If there were nothing in the case, other than what has just been described, I would say that the method of operation made the Shields job a dangerous one.

However, in addition to the throttle, which was being operated by the temporary wooden handles, each winch was supplied with a separate steam valve, part of the permanent mechanism, which shut off the steam between the engine room and the trottle and which it was customary practice for an oiler to close before he began oiling any particular winch. With this steam valve closed, the winch could be oiled with absolute safety regardless of anything the winch operator might do and regardless of any method, proper or improper, which might have been in use for starting and stopping the winches by the rigged-up throttle arrangement.

It is, of course, a breach of the employer's duty to put a man to work in an unsafe situation over which the man has no control. It is an entirely different thing when the workman has it in his power to make the place safe by a simple and ordinary precaution. The employer's duty must be measured by commonly accepted standards. Work has to be done on pieces of machinery of various types, particularly electrical apparatus, which are extremely dangerous unless they are rendered "dead" by pulling a switch or closing a valve. In such cases the employer's duty to furnish a safe place to work is fully met if the switch or valve is there and the man knows how to use it—in other words, if the employer has supplied a reasonable and safe method of making the work perfectly safe. The fact that someone other than the workman can create a danger *unless* the workman takes the normal steps to make the machine safe does not make the employer responsible.

Shields knew about the steam valve on the winch. He knew its function, he knew that it was there to make the winch safe while it was being oiled and he understood that it was his right to turn it off before he began to oil the machinery. As a matter of fact, fifteen minutes before he started to oil the port winch, when he had oiled the starboard winch at No. 2 hatch, the first assistant engineer who was observing him had closed the steam valve on that winch before Shields went to work.

### Conclusions of Law as to the Claim for Damages.

1. Assuming, but not finding, that the respondent did not give Shields specific instructions as to the proper method of oiling the winches, I hold (a) that it was under no duty to do so, and (b) that its failure to do so was not a cause of the accident.

2. The fact that the spout of the oil can which Shields was using was three inches shorter than the regular length spout, had no part in causing the accident.

3. The respondent did not fail in any duty to supply a safe place for the libellant to work. The method of operating the winch adopted by the longshoremen did not render the place where Shields was working unsafe nor make it dangerous for him to oil the winch, so as to place any liability in respect of it upon the respondent.

4. The respondent cannot be charged with liability for the negligent act of the winch operator or the signal man in starting the winch while Shields was working on it.

5. The libellant is not entitled to recover damages.

### Maintenance, Cure and Wages.

█ The libellant's right to cure and maintenance and wages is based upon a legal obligation which is an incident of his contract of service with the vessel. It is imposed upon the shipowner and no one else, and has nothing in common with the seaman's right of action for injuries caused by negligence. It was entirely outside of the libellant's cause of action against Sobelman, could not have been involved in that suit and, consequently, was not, and was not intended to be, released by the instrument which settled that case. See Jones v. Waterman S. S. Corp., 3 Cir., 155 F.2d 992.

█ The libellant claims for maintenance and cure from the date of the accident up to January 1, 1947, less the period of time which he spent in the hospital, or a total of 736 days. The respondent contends that in no event is the libellant entitled to maintenance and cure beyond the date when he ceased to receive medical attention as a result of the accident, or February 1, 1945. The only general rule as to the extent of the obligation for maintenance and cure that can be gathered from the decisions is that it may extend beyond the termination of the voyage and depends upon the seaman's need or, as was stated in The Point Fermin, 5 Cir., 70 F.2d 602, 604, "for a reasonable time and until it became apparent that the injury could not be benefited by further treatment." In The Bouker No. 2, 2 Cir., 241 F. 831, 835, the Court stated "We hold that * * * the duty of the ship and owner persists for a reasonable time after the termination of voyage and wage rela-

tion" and further, "* * * that the limits of cure or care, both as to kind of treatment and time of continuance, must always depend on the facts of each particular case."

█ The libellant still has difficulty in using his right hand, which may be slightly helped by treatment. The stump of the left arm gives him considerable trouble and, particularly when jarred, is painful. Further treatments have been recommended for the purpose of removing this undue sensitivity and, though I am not ruling whether or how long the libellant will be entitled to maintenance and cure in the future because of this condition, I believe that up to the date for which he claims maintenance and cure, he has not reached the point in his recovery where "care and nursing" would not benefit him.

Under the circumstances of this case and in view of the holding of the Circuit Court of Appeals in Loverich v. Warner Co., 3 Cir., 118 F.2d 690, I am of the opinion that the obligation to provide maintenance and cure extends to the point of time for which the libellant contends. He is entitled to $3.50 a day which is the amount established by the regulations of the War Shipping Administration, or a total of $2,576.

█ As to wages: I think he is entitled to wages for the full year. His obligation under the Shipping Articles was to serve on a voyage from Philadelphia to ports in any part of the world as the master might direct "and back to a final port of discharge in the United States for a term of time not exceeding twelve calendar months." The fact that the "Hannibal Hamlin" actually returned to a port of discharge in the United States, where the crew was paid off, on December 31, 1944, does not limit the right to wages for the entire year.

There seems to be no important difference between the terms of these articles and those construed by the Circuit Court of Appeals in Jones v. Waterman S. S. Corp., supra. When a seaman is injured in service of the ship he is entitled to wages for the term of his obligation. To hold otherwise, the Shipping Articles would have to be interpreted as also meaning that after leaving Philadelphia the first port in the

United States that is called upon could be the termination of the voyage and the seaman would be free to leave her. This was obviously not the intention of the parties nor do I think that the words admit of this construction.

### Conclusion of Law.

In the present case the libellant is entitled to wages for a year, plus bonus for eleven months, or until the end of the war in August, 1945. The total wages amount to $2,530 which will be awarded to him.

### Damages and Contributory Negligence.

I have found that the libellant is not entitled to damages. However, I think it proper to make a finding as to the amount of damages incurred by him, so that, in the event that an appellate court should come to a different conclusion, the case would not have to be remitted for further findings. This makes it incidentally necessary to deal with the question of contributory negligence.

As has been said, there were two causes co-operating to produce this accident. One was the premature and negligent starting of the winch by the winch operator. The other was the fact that Shields had put his hand through an opening in the flywheel in order to reach a bearing on the shaft.

As to the first, it could have been completely eliminated had Shields closed the steam valve, for it would then have been just as safe for him to oil with his hand through the flywheel as any other way.

As to the second, the testimony is not altogether clear on the point but, from it, I find that Shields could have reached the bearing which he wished to oil in two ways, neither of which would have compelled him to put his hand through the flywheel. He could have reached over the wheel and before so doing he could have put up a guard with which it was supplied but which was down at the time. He could also have stepped between the hatch combing and the winch and oiled the bearing directly. That might have been rather close quarters, but I am satisfied that it was entirely possible to do it that way. If he had adopted either of these methods, the starting of the flywheel would not have caught his hand and the operation would have been safe, particularly if he had put up the guard to protect the flywheel. He was clearly guilty of contributory negligence.

Taking all elements of damages into consideration including loss of earning power and pain and suffering and reducing the figure by an amount which represents the extent to which the libellant's own negligence contributed to his injury, I find that the libellant has suffered damages in the amount of $45,000. Of this amount he has received $30,000.

A decree may be submitted in accordance with the findings and conclusions stated in this opinion.