**SHIELDS et al. v. UNITED STATES**
(two cases).
Nos. 9560, 9561.

United States Court of Appeals
Third Circuit.
Argued Jan. 7, 1949.

Decided May 24, 1949.

Dissenting Opinion as Amended
June 15, 1949.

BIGGS, Chief Judge, dissenting in part.

Abraham E. Freedman, Philadelphia, Pa., (Freedman, Landy and Lorry, of Philadelphia, Pa., on the brief), for Shields.

Thomas E. Byrne, Jr., Philadelphia, Pa., (Gerald A. Gleeson, U. S. Atty., Mark D. Alspach, Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for the United States.

Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The subject matter of these appeals is an admiralty action against the United States as the owner and operator of the S. S. Hannibal Hamlin on behalf of a minor seaman for damages resulting from personal injuries sustained in the service of the vessel and for maintenance and cure and wages. In No. 9561 the court below found that the libellant was not entitled to recover damages. In No. 9560 the finding was that libellant was entitled to maintenance and cure and to a year's wages plus a bonus for eleven months.

On September 22, 1944, the day of the accident involved, Shields was nineteen years old. Previously he had had three months at the Sheepshead Bay training school for the Merchant Marine where he had taken the Engine Room Course. After that he had made several voyages as an oiler. Three days prior to his accident he had joined the Hamlin at Philadelphia as an oiler. He was assigned to oiling the deck winches and he did this about four or five times a day for the first two days he was aboard. The third day he reported at eight o'clock in the morning, made ready his equipment and proceeded to oil the aft winches. Finishing with these he went forward where he had the operator shut off the starboard winch, which he oiled. He then went to the port winch. He was oiling this when the operator of the winch, a stevedore employee, prematurely started it. Shields' left hand was caught and crushed in the winch; in his effort to save it, his right hand was also badly mangled. A companion suit on Shields' behalf against the stevedore company came on to trial first. It was settled after the close of the libellant's case for $30,000 and it was stipulated that the testimony in that litigation be received in this matter as part of the evidence.

■ Appellant's main point is that appellee violated its duty in allowing the work to be done in a dangerous fashion and in failing to provide a safe place. We agree that the ship owner's responsibility to furnish a safe place for the crew continues through any hazard created by longshoremen in loading the cargo and engaged by the owner for that purpose. In this connection, as the district judge stated, the method employed by the stevedores in operating the deck winches, if considered by itself, might well be thought dangerous to Shields in his job. The difficulty is that each winch on the deck of the Hamlin had a valve controlling the steam which powered the motor. Shields knew this; specifically he knew that shutting the steam off by turning the valve put the winch out of operation and he frankly stated that he had the right to shut off the steam if necessary in order to oil the winch. He did not shut off the steam to the forward port winch, the one which hurt him, prior to oiling it. Fifteen minutes prior to the accident, the operator of the starboard winch at Shields' direction, had shut off the power while Shields oiled it. In the situation we think it obvious that the district judge was correct in concluding that: "3. The respondent did not fail in any duty to supply a safe place for the libellant to work. The method of operating the winch adopted by the longshoreman did not render the place where Shields was working unsafe nor make it dangerous for him to oil the winch, so as to place any liability in respect of it upon the respondent."

■ Appellant also asserts that appellee failed in its duty to instruct him in his job. We see no merit in this point. From our own examination of the record we agree with the court below that there is nothing in the case to indicate that "any lack of experience or ignorance of the operation of the winches or of the method of oiling them on his part was in any way responsible for his injury."

■ Finally, on the damage appeal, appellant urges that appellee failed in its duty to provide a proper oil-can. The can Shields used had a spout which was broken off three inches shorter than the normal length. With the method used by Shields of oiling the winch through the wheel the normal size oil-can spout itself would have been too short and Shields, as the district

court found, "still would have had to put his hand through the fly wheel."

## Maintenance and Cure

Appellant claimed for maintenance and cure from the date of the accident to January 1, 1947, less his hospitalization period. The district court found that up to that date "he has not reached the point in his recovery where 'care and nursing' would not benefit him." The evidence at the trial indicated that both the stump of the left hand and the crippled right hand were even then in an acute condition which it would reasonably seem, could be helped by further care and treatment. Certainly it cannot be said that "no further improvement * * * is to be expected" (Muruaga v. United States, 172 F.2d 318, 321) or that Shields has been "so far cured as possible." Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 711.

## Wages and Bonus

The trial court thought that under the governing Shipping Articles, Shields was entitled to wages for the full year. The pertinent part of the Articles reads: "It Is Agreed between the Master and seamen, or mariners, of the S/S Hannibal Hamlin * * *, now bound from the Port of Philadelphia, to a point in the Atlantic Ocean to the eastward of Philadelphia and thence to such ports and places in any part of the world * * * as may be ordered or directed * * *, and back to a final port of discharge in the United States, for a term of time not exceeding twelve (12) calendar months."

The identical issue under the same Article language has now been passed upon by the Supreme Court in Farrell v. United States, supra. The court held that it obligated the seaman "* * *. only for the voyage on which the ship was engaged when he signed on and that, when it terminated at a port of discharge in the United States, he could not have been required to reimbark for a second voyage. The twelve-month period appears as a limitation upon the duration of the voyage and not as a stated period of employment."

This is dispositive of the wage question before us. Under the specific directive of the Supreme Court, Shields is only entitled to wages until the actual end of the voyage for which he signed, namely, until December 31, 1944.

## Bonus

The court below gave no reason for allowing Shields bonus money. The bonus was "based on transit of areas of risk" and the rate of the bonus depended on the particular areas traversed.[1] The rate ran from 100% of wages allowed for voyages in Classification I to no bonus at all for voyages in Classification IV. Shields, because of his misfortune, never did sail on the Hamlin and thus did not fulfill the condition precedent for receiving a bonus, i. e. he did not traverse the areas of risk or any of them. Under the facts we can see no justification for permitting the bonus award to stand. Our position finds at least indirect support in the Farrell opinion, supra. The district court in that matter had denied Farrell any bonus for the period while he was ashore. This was upheld on appeal in 2 Cir., 167 F.2d 781. Examination of the petition for writ of certiorari and of the later briefs in the Supreme Court reveal that the bonus phase of the Farrell litigation was not pressed in that tribunal. It is obviously for this reason that while the circuit judgment is affirmed, no specific mention is made regarding the bonus question in the Supreme Court opinion.

The judgment of the district court in No. 9561 will be affirmed. In No. 9560 the judgment with respect to maintenance and cure will be affirmed. That part of said judgment concerning wages and including the bonus award will be reversed and the cause remanded to the district court for further proceedings in accordance with this opinion.

---

[1] Decision 2B, Maritime War Emergency Board, March 14, 1944 and in effect unt'l July 15, 1945. (F.R. April 1, 1944, 3521, 3522). See also Regulations and Decisions of the Board, January 28, 1943, Code of Federal Regulations, Suppl.1943, pp. 2136, 2138.

BIGGS, Chief Judge, dissenting in part and concurring in part.

Shields contends that he is entitled to recover damages against the vessel's owner. The facts on which this contention is based follow.

The winches had been equipped by the stevedoring company, an independent contractor, with wooden extensions which enabled the winchman, an employee of the stevedoring company, to operate two winches either simultaneously or separately. This arrangement necessitated the winchman having his back to Shields who, when he was injured, was oiling one of the winches, and the arrangement also rendered it impossible for the winchman to reach the brake which, if applied, could have stopped the rotation of the flywheel instantly.

Normally also there would have been a separate operator for each winch and the operator could have observed Shields' dangerous act, would not have turned steam into the winch and could have reach-ed the brake. The method or means of operating the winch was a dangerous one, as the court below found,[1] and did in fact subject Shields to hazard unless he made use of the valve on the winch to turn off the steam from it as he should have done.

Shields testified that he told the winchman that he was about to oil the winch. This evidence is credible. The winchman was negligent in starting up the winch while Shields was oiling it.

It was the duty of the shipowner to furnish a seaworthy ship and a safe method or means of operation.[2] The H. A. Scandrett, 2 Cir., 87 F.2d 708. Such a duty is nondelegable. "The duty of the master to provide a safe working place * * * is a positive and continuing one, and cannot be delegated." Pacific American Fisheries v. Hoof, 9 Cir., 291 F. 306, 308, certiorari denied 263 U.S. 712, 44 S.Ct. 38, 68 L.Ed. 520. See also Phillips Petroleum Co. v. Manning, 8 Cir., 81 F.2d 849, 851–2, and Grammer v. Mid-Continent Petroleum Corporation, 10 Cir., 71 F.2d 38, 40–1, certiorari

---

[1] The court below found as follows, 73 F.Supp. 862, 865, "At No. 2 hatch there were two large cargo winches, one on each side of the deck. Each winch had its own separate control, or throttle, and each winch had a brake. For reasons of convenience, or possibly of economy of manpower, the stevedore had rigged a pair of long wooden handles by means of which one man standing between the two winches could operate both, either simultaneously or separately. This arrangement, the libellant contends, led to an improper method of operation which made it dangerous for a man at work oiling the winches, because the winch operator, standing between the wooden handles, would not be likely to see him unless he turned his head. At the time of the accident the operator was not looking and did not see that Shields was working on the winch, and his starting the winch without warning was one of the two prime causes of the accident, the other being Shields' thrusting of his hand through the flywheel. If there were nothing in the case, other than what has just been described, I would say that the method of operation made the Shields job a dangerous one.

"However, in addition to the throttle, which was being operated by the temporary wooden handles, each winch was supplied with a separate steam valve, part of the permanent mechanism, which shut off the steam between the engine room and the throttle and which it was customary practice for an oiler to close before he began oiling any particular winch. With this steam valve closed, the winch could be oiled with absolute safety, regardless of anything the winch operator might do and regardless of any method proper, or improper, which might have been in use for starting and stopping the winches by the rigged-up throttle arrangement."

[2] The court below put this matter very clearly when it stated, 73 F.Supp. at pages 864–865, "Closely assimilated to the duty to furnish a safe place for his own employees to work, and not always distinguishable from it, is the duty to see to it that they are not subjected to danger in the course of their duties by reason of any improper or unsafe methods of carrying on the work by employees of the independent contractor. In most cases the result of such improper methods of work is to create an unsafe place for the employer's own men to perform their work and hence the close interrelation of improper methods and unsafe place. In the present case they come very close to amounting to the same thing and need not be separately considered."

denied 293 U.S. 571, 55 S.Ct. 82, 79 L.Ed. 670. The Supreme Court has ruled on this question against an analogous background in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 100, 66 S.Ct. 872, 880, 90 L.Ed. 1099, where Mr. Justice Rutledge said that the duty of maintaining the vessel in a seaworthy condition " * * * is peculiarly and exclusively the obligation of the owner. It is one he cannot delegate." See the authorities in note 18 cited to the text of the opinion of the Supreme Court.

The United States contends, and this court finds, as did the court below, that by supplying a means to Shields, viz., the steam valve on the winch, whereby he could have turned off the steam and rendered the oiling operation absolutely safe, it fulfilled its duty to Shields. I cannot agree. That Shields was negligent is clear but the shipowner in the exercise of its nondelegable duty was also negligent. The negligence of Shields and the negligence of the shipowner concurred in causing the accident. I cannot conclude that by giving Shields a means, the steam valve, by the employment of which he could have rendered the oiling operation safe, the shipowner insulated itself from the result of its own negligence.

Shields chose a dangerous method of proceeding with the oiling when he could have elected a safe method. But the negligence of a seaman, however gross, will not bar a recovery by him but goes only to the mitigation of damages. Socony-Vacuum Co. v. Smith, 305 U.S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265. In the maritime law the doctrine of comparative negligence is applicable. Beadle v. Spencer, 298 U.S. 124, 131, 56 S.Ct. 712, 80 L.Ed. 1082. The majority opinion gives no effect to this principle since it takes the view that the shipowner was not negligent in any particular and that the vessel was seaworthy in all respects.

I would allow Shields some measure of recovery.

By executing a release to the stevedoring company, Shields did not release the owner of the vessel. The law is stated correctly in McKenna v. Austin, 77 U.S.App.D.C. 228, 134 F.2d 659, 148 A.L.R. 1253. It should be borne in mind also, as the court below found, that the settlement made by Shields with the stevedoring company was without prejudice to his claim against the vessel, her owners and operators. The United States conceded that the release to Sobelman was not a release to the United States.

I concur with the majority on all the other points ruled on in the opinion of the court.