Anthony VITCO, Libelant,

v.

Marion JONCICH, Joseph C. Mardesich, Antonia Dogdanovich, Respondents.

No. 16187.

United States District Court
S. D. California, Central Division.

April 29, 1955.

Margolis, McTernan & Branton, Los Angeles, Cal., for libelant.

Robert Sikes, Los Angeles, Cal., for respondents.

MATHES, District Judge.

The admiralty jurisdiction of this court is here invoked by a libel in personam filed by a tuna fisherman, without prepayment of fees or costs and without security therefor, 28 U.S.C.A. § 1916, to recover maintenance and cure and wages to the end of the period of his employment. Adm.Rule 13, 28 U.S.C.A.; Sheppard v. Taylor, 1831, 5 Pet. 675, 711, 30 U.S. 675, 711, 8 L.Ed. 269.

The facts, as disclosed upon the trial, are briefly these. Respondents are the owners of the commercial fishing vessel Pioneer. In the fall of 1951 libelant, who had shipped over many years from Pacific ports as fisherman-cook, was approached by respondent Joncich to "fish tuna" with the Pioneer during the ensuing "season."

Libelant had previously fished tuna with respondents aboard the Pioneer, and orally accepted respondent's invitation for the 1952 season. He then joined with other members of the crew, as is the custom, in spending a month or so without compensation preparing vessel and nets for the season's venture.

The vessel thus made ready for the first trip, on December 27, 1951, libelant and other members of the crew signed shipping articles "between the Master and seamen, or mariners, of the American Oil Screw "Pioneer" of which Joseph C. Mardesich is the present Master, or whoever shall go for Master, now bound from the Port of Los Angeles, California, to Mexican Waters and such other ports and places in any part of the world as the Master may direct, and back to a final port of discharge in the United States, for a term of time not exceeding 12 calendar months." See: 46 U.S.C.A. § 713; Id. §§ 564–568; Id. §§ 572–575.

In late January, 1952, while the Pioneer was in Mexican waters on the first fishing trip of the season, libelant suffered a series of heart attacks, as a result of which he was forced to leave the vessel at Manzanillo, Mexico, on January 29, 1952, and return home to San Pedro, California, totally disabled for further service during the period of his employment.

Libelant went to the marine hospital of the United States Public Health Service in San Pedro on March 7, 1952, where he received treatment and an electrocardiogram was taken. At the recommendation of respondent Joncich he then placed himself under the care of a private physician, with whom he incurred a bill of $135; and ultimately went to a physician recommended by his proctors, where he incurred for his own account a further bill of $348. In October, 1953, this latter physician determined that a maximum cure for libelant's heart condition had been reached during August, 1954.

Libelant urges that he is entitled to recover (1) his share of the tuna catch by the Pioneer for the entire 1952 season, as his wages for the period of his seaman's contract of maritime employment; (2) the sum of $6 per day as maintenance from the time his illness

compelled him to leave the vessel on January 29, 1952 until October, 1954, when it was determined that his heart condition had been cured to the extent practicable; and (3) all medical expense incurred for his private account during this period of cure.

Respondents, *per contra*, contend: (1) that since libelant became totally disabled on the first trip of the season, he is entitled to wages—a share of the catch—for only the single trip on which he fell ill; (2) that since the date on which the seaman in fact reaches maximum cure is controlling, libelant is not entitled to maintenance beyond August, 1954, even though the fact he had reached maximum cure was not determined until October, 1954; and (3) that since libelant declined free medical treatment readily available to him at the marine hospital of the United States Public Health Service, he is not entitled to recover the cost of cure which he privately secured for his own account.

■ Considering these stated contentions in their inverse order, it is well to recall at the outset that the obligation of a shipowner to furnish cure, and maintenance as well, to a seaman who falls ill or is injured while in the service of the vessel is imposed by maritime law as an incident to the contract of employment. Aguilar v. Standard Oil Co., 1943, 318 U.S. 724, 730, 63 S.Ct. 930, 87 L.Ed. 1107; Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 527, 58 S.Ct. 651, 82 L.Ed. 993; Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368; Pacific S. S. Co. v. Peterson, 1928, 278 U.S. 130, 138, 49 S.Ct. 75, 73 L.Ed. 220; The Iroquois, 1904, 194 U.S. 240, 241, 24 S.Ct. 640, 48 L.Ed. 955; The Osceola, 1903, 189 U.S. 158, 172, 23 S.Ct. 483, 47 L.Ed. 760; Harden v. Gordon, C.C.D.Me. 1823, 11 Fed.Cas. pp. 480, 482, No. 6,047.

■ The correlative maritime right of the seaman to receive maintenance and cure exists regardless of whether the compensation contracted for consists in specific money wages or, as here, in a lay or share of "the catch"—a share of the earnings of the vessel. The Betsy Ross, 9 Cir., 1944, 145 F.2d 688, 689; Luksich v. Misetich, 9 Cir., 140 F.2d 812, 814, certiorari denied, 1944, 322 U.S. 761, 64 S.Ct. 1280, 88 L.Ed. 1589; The Josephine & Mary, 1 Cir., 1941, 120 F.2d 459, 461; Enochasson v. Freeport Sulphur Co., D.C.S.D.Tex.1925, 7 F.2d 674; The Atlantic, D.C.S.D.N.Y.1849, 2 Fed.Cas. pp. 121, 130, No. 620; Reed v. Canfield, C.C.D.Mass.1832, 20 Fed. Cas. pp. 426, 429, No. 11,641.

■ As to the quantum of the shipowner's duty, Mr. Chief Justice Stone said in Calmar S. S. Corp. v. Taylor, supra: "The maintenance exacted is comparable to that to which the seaman is entitled while at sea * * *, and 'cure' is care, including nursing and medical attention during such period as the duty continues." 303 U.S. at page 528, 58 S.Ct. at page 653.

■ And "courts take cognizance of the marine hospital service where seamen may be treated at minimum expense, in some cases without expense, and they limit recovery to the expense of such maintenance and cure as is not at the disposal of the seaman through recourse to that service." Id., 303 U.S. at page 531, 58 S.Ct. at page 654; see Aguilar v. Standard Oil Co., supra, 318 U.S. at page 729, 63 S.Ct. 930.

■ Accordingly, since libelant abstained, for reasons of his own, from availing himself of the services and facilities of the United States Public Health Service in his home town of San Pedro, whereat it appears substantially the same services as were rendered by the private physicians were readily available to him without charge, libelant cannot recover the costs of privately-obtained treatment as part of the cure which the law awards as an incident of the seaman's employment. See: Bailey v. City of New York, 2 Cir., 1946, 153 F.2d 427; Benton v. United Towing Co., D.C.N.D.Cal.1954, 120 F.Supp. 638, 641; cf. Luth v. Palmer Shipping Co., 3 Cir., 210 F.2d 224, certiorari denied, 1954, 347

U.S. 976, 74 S.Ct. 788, 98 L.Ed. 1116, and comment by Roscoe Pound, 14 NACCA L.J. 203 (Nov. 1954); Repsholdt v. United States, 7 Cir., 205 F.2d 852, 856–857, certiorari denied, 1952, 346 U.S. 901, 74 S.Ct. 226, 98 L.Ed. 401; Van Camp Sea Food Co. v. Nordyke, 9 Cir., 140 F.2d 902, 906–907, certiorari denied, 1944, 322 U.S. 760, 64 S.Ct. 1278, 88 L.Ed. 1587.

■ What has just been said, however, denies recovery only as to the $348 which libelant incurred for his own account with the physician to whom he was referred by his proctors. As to the bill of $135 incurred with the physician to whom libelant was referred by respondent Joncich, it is found that respondents authorized the private service and in effect consented to bear the physician's reasonable charge. See: McManus v. Marine Transport Lines, 2 Cir., 1945, 149 F.2d 969; June v. Pan-American, etc., Co., 5 Cir., 1928, 25 F.2d 457; The Bouker No. 2, 2 Cir., 241 F. 831, 835–836, certiorari denied, 1917, 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529; cf. United States v. Loyola, 9 Cir., 1947, 161 F.2d 126, 128.

■ The shipowner's obligation to furnish maintenance is coextensive in time with his duty to furnish cure, Skolar v. Lehigh Valley R. Co., 2 Cir., 1932, 60 F.2d 893, 895; cf. The J. F. Card, D.C.E.D.Mich.1890, 43 F. 92, and neither obligation is discharged until the earliest time when it is reasonably and in good faith determined by those charged with the seaman's care and treatment that the maximum cure reasonably possible has been effected. Farrell v. United States, 1949, 336 U.S. 511, 517–519, 69 S.Ct. 707, 93 L.Ed. 850; cf. Calmar S. S. Corp. v. Taylor, supra, 303 U.S. at pages 528–530, 58 S.Ct. 651; The Osceola, supra, 189 U.S. at page 175, 23 S.Ct. 483; Desmond v. United States, 2 Cir., 1954, 217 F.2d 948, certiorari denied 349 U.S. 911, 75 S.Ct. 600; Reed v. Canfield, supra, 20 Fed.Cas. at page 429, No. 11,641.

■ It follows that the libelant at bar is entitled to maintenance from respondents at the agreed rate of $6 per day from the time illness compelled him to leave the vessel on January 29, 1952, until October 15, 1953, when—it is now found—his physician reasonably and in good faith determined for the first time that further treatment would not advance cure.

■ Along with the obligation to provide maintenance and cure, the maritime law attaches to the seaman's contract of employment the right to receive his agreed wages throughout the period of employment, cf. The City of Alexandria, D.C.S.D.N.Y.1883, 17 F. 390, 396; The Osceola, supra, 189 U.S. at page 175, 23 S.Ct. 483; which historically has meant "to the end of the voyage", since "the general custom in ships, other than the coastwise trade, is to sign on for a voyage rather than for a fixed period." Farrell v. United States, supra, 336 U.S. at page 520, 69 S.Ct. at page 711.

Generally speaking then, whether the employment is for a voyage or for a definite time, 46 U.S.C.A. § 572, it is the shipowner's obligation to pay a seaman, who falls ill or is injured while in the service of the vessel, full wages throughout the period of employment. Farrell v. United States, supra, 336 U.S. at pages 519–521, 69 S.Ct. 707; Jones v. Waterman S. S. Corp., 3 Cir., 1946, 155 F.2d 992, 995; Pacific Mail S. S. Co. v. Lucas, 9 Cir., 1920, 264 F. 938, affirmed, 1922, 258 U.S. 266, 42 S.Ct. 308, 66 L.Ed. 614; Shields v. United States, D.C.E.D.Pa.1947, 73 F.Supp. 862, 866, modified, 3 Cir., 175 F.2d 743, certiorari denied, 1949, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553; Warren v. United States, D.C.D.Mass.1948, 75 F.Supp. 836; The Hawaiian, D.C.D.Md. 1940, 33 F.Supp. 985.

■ From earliest times the seaman's share in the proceeds of the voyage has been considered "as in the nature of wages." Harden v. Gordon, supra, 11 Fed.Cas. at page 481, No. 6,-

047. "Although seamen in whaling (fishing) voyages are compensated by shares of the proceeds, this compensation is always treated as in the nature of wages. They are never deemed partners * * * the very nature of the service excludes the notion of partnership. It would defeat the very objects of the parties." Story, J. in Reed v. Canfield, supra, 20 Fed.Cas. at page 429, No. 11,641; 3 Kent's Commentaries, 34 (8th ed. 1844).

So where as here the term of employment is the "tuna season", a seaman who falls ill in the service of the vessel is entitled *pari ratione* to full wages—i. e. his share of the catch—for the entire "tuna season." The Betsy Ross, supra, 145 F.2d at page 689; Luksich v. Misetich, supra, 140 F.2d at page 815; Mason v. Evanisevich, 9 Cir., 1942, 131 F.2d 858, 859; The Montague, D.C. W.D.Wash.1943, 53 F.Supp. 548; Enochasson v. Freeport Sulphur Co., supra, 7 F.2d 674; Welch v. Fallon, D.C.D.Mass. 1909, 181 F. 875, 878; cf. Pavlis v. Jackson, 5 Cir., 1942, 131 F.2d 362, 365, certiorari denied, 1943, 318 U.S. 769, 63 S.Ct. 761, 87 L.Ed. 1140.

But respondents urge here that this maritime wage obligation to libelant was modified, as to the right to wages during periods of disability due to illness, by the terms of the "1949 Working Agreement" between the International Fishermen and Allied Workers of America, Local No. 33, whereof libelant is a member, and the respondents at bar, which provides in paragraph V that:

"In event illness incapacitates any crew member from further work on board the vessel, he shall be entitled to receive his proportionate share of the earnings of the vessel to the date and hour said member leaves the boat. Upon regaining his health, he shall be reemployed on the boat. During illness, such member may be substituted for by another man. An ill member cannot demand his share while ashore. This paragraph does not pertain to a member injured on the boat."

Assuming the union contract is *pro tanto* the employment contract of every member, cf. Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp., 348 U.S. 437, 75 S.Ct. 488 (1955) the question remains whether a seaman may contract away that which the maritime law attaches as an incident of the relationship—the right to wages for the full period of his employment.

It is seen at once that the agreement at bar, while fully protecting wages of the unfortunate seaman who is incapacitated due to injury, provides a forfeiture of wages of the equally unfortunate seaman who is incapacitated due to illness. There is no apparent basis in reason for this discrimination, based as it is solely upon difference in cause of involuntary disability.

Nor is there any compensating advantage to the seaman whose share of the remainder of the season's catch, forfeited for circumstances beyond his control, is by the quoted provisions destined—not for the remaining members of the crew, whose pre-season labors, like his own, aided in preparing vessel and nets for the season ahead—but for "another man", presumably a stranger to the pre-season labors of the crew. Cf. The Atlantic, supra, 2 Fed.Cas. at pages 127–130, No. 620.

In Robertson v. Baldwin, 1897, 165 U.S. 275, 17 S.Ct. 326, 41 L.Ed. 715, Mr. Justice Brown observed for the court that: "From the earliest historical period the contract of the sailor has been treated as an exceptional one, and involving, to a certain extent, the surrender of his personal liberty during the life of the contract." 165 U.S. at pages 282–283, 17 S.Ct. at page 329.

These and other considerations have given rise to the established public policy of the maritime law to protect from impairment the seaman's historic rights to maintenance and cure, and to wages for the term of his employment. Hence courts of admiralty, while viewing with favor that which augments, O'Donnell v. Great Lakes

Dredge & Dock Co., 1943, 318 U.S. 36, 43, 63 S.Ct. 488, 87 L.Ed. 596, look with disfavor upon agreements in derogation of these maritime rights. See: Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239; Bainbridge v. Merchants' & Miners' Transp. Co., 1932, 287 U.S. 278, 53 S.Ct. 159, 77 L.Ed. 302; Pacific S. S. Co. v. Peterson, supra, 278 U.S. at page 138, 49 S.Ct. 75.

This public policy against diminution in amount or postponement of payment, and even against prepayment, of a seaman's wages finds expression in 46 U.S.C.A. §§ 591–605. And while it is expressly provided for obvious reasons that many of these statutes "shall not apply to fishing or whaling vessels", it is nonetheless true, as Judge Goodman said in Gayner v. The New Orleans, D. C.N.D.Cal.1944, 54 F.Supp. 25, that "the fullest protection to seamen for *all maritime services* has always been the policy of the Admiralty." 54 F.Supp. at page 27.

By 46 U.S.C.A. § 601 "attachment or arrestment from any court" of any "wages due or accruing to any seaman or apprentice" is forbidden. See McCarty v. City of New Bedford, D.C.S.D.N.Y. 1880, 4 F. 818, 826–829. And § 600 provides that "No seaman shall, by any agreement other than is provided by sections [not material here] * * *, forfeit his lien upon the ship, or be deprived of any remedy for the recovery of his wages to which he would otherwise have been entitled; and every stipulation in any agreement inconsistent with any provision of such sections, and every stipulation by which any seaman consents to abandon his right to his wages in the case of the loss of the ship, or to abandon any right which he may have or obtain in the nature of salvage, shall be wholly inoperative." See: Strathearn S. S. Co. v. Dillon, 1920, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607; Lakos v. Saliaris, 4 Cir., 1940, 116 F.2d 440; The Constellation, D.C.E.D.N.Y.1937, 20 F.Supp. 892; Conekin v. Lockwood, D.C. E.D.S.C.1916, 231 F. 541; The Gen. J.

A. Dumont, D.C.E.D.Va.1907, 158 F. 312; Restatement, Contracts, § 580(1), (2) (e) (1932).

While our maritime law permits a seaman full freedom of contract in fixing the term of his employment and the rate of his pay, the policy throughout our national history has been consistent in protecting the rights of seamen to their full wages and to maintenance and cure. With respect to the latter, Mr. Justice Cardozo said for the Court in Cortes v. Baltimore Insular Line, supra: "The duty * * * is imposed by the law itself as one annexed to the employment. * * * Contractual it is in the sense that it has its source in a relation which is contractual in origin, but, given the relation, no agreement is competent to abrogate the incident." 287 U.S. at page 371, 53 S.Ct. at page 174.

The same historical considerations, the same considerations of reason and policy, combine to impel a court of admiralty to declare *pro tanto* void, as contrary to public policy, a contract such as that at bar which without *quid pro quo* deprives a seaman of wages because of unavoidable illness during the term of his employment. See: Venides v. United Greek Shipowners Corp., 2 Cir., 1948, 168 F.2d 681; Glandzis v. Callinicos, 2 Cir., 1944, 140 F.2d 111; Lakos v. Saliaris, supra, 116 F.2d at page 444; Harden v. Gordon, supra, 11 Fed.Cas. at page 485–486, No. 6,047; cf. Watts v. J. B. Camors & Co., 1885, 115 U.S. 353, 361–362, 6 S.Ct. 91, 29 L. Ed. 406; United States v. The Grace Lothrop, 1877, 95 U.S. 527, 24 L.Ed. 514; The Lottawanna, 1874, 21 Wall. 558, 577, 88 U.S. 558, 577, 22 L.Ed. 654.

It is always well to heed the admonition of Lord Burrough in Richardson v. Mellish, 2 Bing. 294, 303 (1824) that ordinarily public policy "is a very unruly horse, and when once you get astride it you never know where it will carry you." [See 5 Williston, Contracts 4555, § 1629 (1937).] However, the public policy to which effect is given here is well rooted both in Congressional enactments and in maritime history.

952

As Mr. Justice Story said when sitting as Circuit Justice in Harden v. Gordon, supra, "if additional burthens or sacrifices are imposed upon the seamen without adequate remuneration, the court feels itself authorized to interfere and moderate or annul the stipulation. And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen." 11 Fed.Cas. at page 485, No. 6,047; see: The San Marcos, D.C.S.D.N.Y.1886, 27 F. 567; The Betsy and Rhoda, D.C.D. Me.1840, 3 Fed.Cas. p. 305, No. 1,366; Brown v. Lull, C.C.D.Mass.1836, 4 Fed. Cas. pp. 407, 409, No. 2,018; The Sarah Jane, D.C.S.D.N.Y.1833, 21 Fed.Cas. p. 449, No. 12,348; cf. The Atlantic, supra, 2 Fed.Cas. at pages 127–130, No. 620.

If then the seaman himself is powerless, for reasons of public policy, to part with his right to wages, the union as collective bargaining agent, *a fortiori*, is powerless so to do. See: Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 773–774, 72 S.Ct. 1022, 96 L.Ed. 1283; Wallace Corp. v. National Labor Relations Board, 1944, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216; Ahlquist v. Alaska-Portland Packers' Ass'n, 9 Cir., 1930, 39 F.2d 348.

■ It follows that, notwithstanding the quoted provisions of the union contract, libelant is entitled to his wages for the full term of his employment—the "tuna season."

There remains the question as to the duration of that season. The actual duration of the season for tuna fishing is roughly the calendar year. But here again respondents invoke the union contract which in effect divides what is in truth a single uninterrupted season into two, by providing in paragraph XIV that:

"When crew members are hired, they are hired for the season and may be discharged only for good cause shown.

"For boats fishing tuna all-year-around, there shall be two tuna seasons within a year. One season shall commence on January 1st and end on the following June 30th, and the next tuna season shall commence on July 1st, and end on the following December 31st. When a boat arrives subsequent to the season termination date, the completion of the trip shall be deemed the end of the season."

It was the practice for the Pioneer to fish tuna "all-year-around." And when respondent Joncich proposed that libelant join the crew for the 1952 season, he mentioned "next year"; he also mentioned the possibility of libelant's share for the year being as much as $10,000; and libelant's last previous engagement with respondents had been for the full tuna season during an entire year.

■ Although the provisions of the collective-bargaining agreement dividing the season are valid, the circumstances in evidence at bar, including the fact that the articles specify a maximum period of twelve months, require the finding that libelant was in fact employed for the full tuna fishing season of the calendar year. See: Farrell v. United States, supra, 336 U.S. at pages 519–521, 69 S.Ct. 707, 93 L.Ed. 850; National Labor Relations Board v. Waterman S. S. Corp., 1940, 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704; Jones v. Waterman S. S. Corp., supra, 155 F.2d at page 996; Enochasson v. Freeport Sulphur Co., supra, 7 F.2d 675; Ziegler v. Marine Transport Lines, D.C.E.D.Pa. 1947, 78 F.Supp. 216, 220; Shields v. United States, supra, 73 F.Supp. at page 866.

■ The contract of employment, so construed, does not violate the collective bargaining agreement, since it gives libelant more favorable conditions than the minima specified in the union contract. Cf. Warren v. United States, supra, 75 F.Supp. at page 839; Harden v. Gordon, supra, 11 Fed.Cas. at page 485, No. 6,047.

Furthermore, since the contract of employment is maritime in character, it is not as so construed subject to the California Statute of Frauds, Cal.Civ.Code, § 1624, declaring invalid among others an agreement that "by its terms is not to be performed within a year from the making thereof." See Union Fish Co. v. Erickson, 1919, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261.

The result is that libelant is entitled to recover not only cure and maintenance, as stated above, but also as wages his lay or share of the catch for the full 1952 tuna fishing season—$6,681.95—less appropriate withholding and social security tax deductions as required by law. United States v. Johnson, 9 Cir., 1947, 160 F.2d 789, 797, affirmed in part and reversed in part, 1948, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468.

Proctors for libelant will lodge with the Clerk within ten days appropriate findings of fact, conclusions of law and decree, to be settled pursuant to local rule 7.