### MONTILLA v. UNITED STATES.
#### No. 17396.

District Court, E. D. New York.
Nov. 21, 1946.

O. Raymond Basile, of New York City, for libellant.

J. Vincent Keogh, U. S. Atty., of New York City (Joseph K. Inness, of New York City, of counsel), for the Government.

INCH, District Judge.

Libellant brings this suit against the United States of America pursuant to Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., and all Acts supplemental thereto and amendatory thereof.

In his libel, he states that he was a seaman (Third Army cook) employed on the S. S. Uruguay. That during the course of his employment as such seaman, he became sick and developed, acquired and sustained a tuberculosis and/or a pre-existing condition, unknown to him, was aggravated through the negligence of the respondent in failing to provide a proper, safe and seaworthy vessel; in failing to provide proper, safe and seaworthy quarters; in failing to provide a safe place in which to work and safe and competent superior officers. In his second cause of action he claims maintenance and cure.

The respondent answered and denies these allegations as to alleged negligence and sets forth that the vessel was seaworthy, etc., and for further and separate defense alleges that libellant on May 26, 1944, executed a general release.

The case came on for trial and libellant was a witness, as was a physician who had made a physical examination of libellant on May 27, 1946. Respondent offered in evidence depositions taken of officers of the ship, among them the chief medical officer of the ship, and witnesses in reference to the signing of the general release by libellant. Libellant also offered in evidence the deposition of a fellow employee, who was a messman. The record contains the usual hospital records, so that at the end of the trial the court had before it a complete statement of the facts surrounding libellant's claim and the defense.

There is no need in this opinion to go into all the details, suffice it to say that libellant is a Filipino 44 years old, and has been going to sea for some seventeen

years, always in the steward or kitchen department.

The S. S. Uruguay during the period from February to October 1943, was a former passenger vessel converted into a troopship carrying from four to five thousand soldiers. Because of war conditions, vigilance had to be strictly enforced over blackouts at night, and apparently it was at times a part of a convoy. It had experienced officers and crew, a chief medical officer, who was a graduate physician, the usual assistants and a ship's hospital.

Libellant first signed up on this vessel on a trip which was completed at Newport News, March 25, 1943. In a few weeks thereafter, he reshipped on this vessel and after the completion of that voyage he once more reshipped. Each time, it was as Third Army cook and his work and conditions were the same. As a rule, his place of work was in front of steamers where eggs were steamed and potatoes boiled, and near a pot washer. This was in the galley and after each service of meals this galley deck was washed down and cleaned.

There were daily inspections by the various officers of the ship, including a representative of the Army, and the chief medical officer, which inspection related also to the sleeping quarters of the crew. There has been nothing shown before me to indicate negligence on the part of the respondent in this regard, or to show that the sleeping quarters were not reasonably safe and adequate.

Libellant was entirely familiar with all of such things and yet he repeatedly signed up and sailed with this vessel, and I find no basis for finding that his subsequent illness on the last trip can be attributed to any breach of duty on the part of those in charge of the vessel. On the contrary, it seems to me that Dr. Sewall, the chief medical officer, did all that was possible to relieve the physical condition of libellant and it was decided that, after consultation with doctors in certain ports on the trip, it was best for libellant to remain on the ship and be brought home, rather than left in a hospital in some foreign port where he would receive no better treatment than he was receiving on board the Uruguay.

As regards the cause of action for negligence, therefore, I find no liability on the part of the respondent. The question of a release as to such cause of action is not necessary to discuss. As to the second cause of action for maintenance and cure, however, a different situation exists.

I am satisfied from the medical testimony, which includes the testimony of libellant's own physician, who was an expert on tuberculosis, that libellant, prior to his shipping on the Uruguay on this last trip, was suffering from minimal tuberculosis and very possibly had been so suffering for some time before. This condition is an arrested type of tuberculosis, and the medical testimony, including that of Dr. Lang, libellant's witness, indicates that as tuberculosis is a germ, no one can indicate with any assurance when the germ is implanted, but as Dr. Sewall states it is most unusual for it to make its appearance as suddenly as in this case and experience is to the contrary.

Dr. Lang testified that when he examined libellant as late as May 27, 1946, he found his physical condition fairly well-developed and well-nourished, temperature 98, pulse 78, and that the tuberculosis was apparently arrested. That he, at no time, had more than minimal tuberculosis and that the practice at the Marine Hospital was to discharge a tubercular patient only when his condition is apparently arrested. This means his sputum is negative and chances are it will remain negative and is not progressive.

This brings us to what actually happened to libellant. In his work as Third Army cook in the galley, he caught cold and developed pleurisy. In his previous physical condition, not due to any negligence on the part of the respondent, this pleurisy made his tubercular condition more acute and no doubt he was a sick man. Dr. Sewall at once put him in the ship's hospital. He went up on deck occasionally for sunlight and fresh air, and when the vessel arrived at Hobart, Tasmania, he was taken ashore to the hospital, X-rayed and returned to the ship. It was decided by the doctors the best thing for him was to remain on the ship. The water that had collected in his lung was removed, and

again, when the ship reached Australia, he was taken ashore and X-rayed. The X-ray showing no change and so it continued on the voyage.

When possible, libellant was taken ashore and X-rayed and his condition discussed by Dr. Sewall with other doctors. At one time prior to the final stop before leaving for California, casualties had been taken aboard and Dr. Sewall then had libellant removed from the ship's hospital on B deck to a comfortable room on A deck which he usually occupied by himself. After the fluid had been taken from the lung, libellant had a slight amount of discomfort and a low grade fever. He was afforded, according to Dr. Sewall, "all the facilities that his condition required, good food, good rest, sunlight, fresh air, vitamines and exercise. His condition did not change, from the time I first saw him, until he returned to California."

There is no substance to the charge that libellant should have been put ashore in some foreign hospital because of his condition, or that his accommodations on the ship were not as satisfactory as could reasonably be found. When libellant reached California he was immediately taken to the hospital where he stayed until April 14, 1944. His transportation was then paid by respondent and he entered the United States Marine Hospital at Staten Island, May 31, 1944. He was discharged on July 17, 1944, at which time his condition was "static" and no further hospitalization or medical attention was required except for a routine checkup.

Thereupon, according to libellant, he was sent to a rest camp on Long Island for six weeks. He then went to the New York State Rehabilitation Bureau where he took occupational therapy from October until April 1946. While attending that school they gave him $60 compensation every month for maintenance and transportation. They then located a job for libellant, but he did not like it and left as he says the work was too heavy. He is now working for another company, eight hours a day, earning approximately $28 a week. He says, "when I come home I rest, I read the papers."

The impression I get from the testimony of Dr. Sewall, the chief medical officer, is that during this attack of pleurisy he was deeply concerned with seeing that libellant had the best care possible.

Dr. Lang agrees with the other doctors that libellant should continue to have routine checkups every three or six months.

This brings us to what the respondent has done regarding maintenance and cure. When libellant was discharged July 17, 1944, his condition was said to be "static" and no further hospitalization or medical attention required. When Dr. Lang examined him on May 27, 1946, he states he found that he was fairly well-developed and well-nourished and that the tuberculosis was apparently arrested. That at no time did he have more than minimal tuberculosis. That the chances are it will remain negative.

Counsel for respondent states that assuming that libellant was entitled to maintenance and cure from April 14, 1944, when he left San Francisco hospital, to May 31, 1944, when he entered the Staten Island hospital as an out-patient, maintenance and cure at $2.75 per day amounts to $129.25. He was, however, paid $665 plus $117 transportation and $20 for meals from San Francisco to New York together with the hospitalization for months at San Francisco and the care at Staten Island.

He now is apparently in the same condition that he was before he signed on the trip as far as the tuberculosis is concerned. He had pleurisy which occasioned pain and discomfort and left him with some scar or thickening of the plura. This required a duty to be performed by respondent to provide reasonable maintenance and cure as there is no doubt but that libellant suffered from this illness while in the service of the ship.

Assuming that this court, in view of all the facts, was called on to fix the amount of such maintenance and cure, we have the undisputed payments of $665 in discharge of such duty, not including the other expenses and hospitalization paid by the respondent. There is nothing about this amount that plainly indicates an entirely inadequate payment. On the contrary,

counsel for respondent urges that it is more than should be required.

The limits of the liability for care and cure of a sick seaman must always depend upon the facts of each particular case. The Bouker No. 2, 2 Cir., 241 F. 831.

On the other hand, the shipowner's duty in this regard does not extend beyond the time when he is as completely cured as possible. Lindgren v. Shepard S. S. Co., 2 Cir., 108 F.2d 806.

Where a seaman is suffering from an incurable disease which manifests itself during his employment, though not caused thereby, an award of a lump sum in anticipation of a continuing need of maintenance and cure for life cannot be sustained. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

It would seem that since the pleurisy had been cured and the minimal tuberculosis arrested as it was before libellant shipped, that the limit has been reached for the period in which maintenance and cure can be provided, even though the date may be considered by some to be uncertain. I am inclined therefore to find that respondent has fulfilled its duty.

However, this brings us to the separate defense of the general release by libellant of respondent. This release (Respondent's Exhibit A) is dated May 26, 1944, signed by libellant and purports, in exchange for $665, to release the War Shipping Administration and Moore-McCormack Lines, Inc., agent, from all liability of every nature which libellant had "or may hereafter have on account of injuries and illnesses suffered by (me) as follows—Tuberculosis Pleurisy with Effusion."

The answer to the various questions are in the handwriting of libellant and he also copied, in his own handwriting, a statement printed in the release that "doctors can make mistakes" and that he "took the risk of their being wrong," and, "if that should be the case, it is my loss, and I cannot back out of the settlement." Libellant's signature was acknowledged and there were witnesses thereto.

The circumstances surrounding this release were the usual ones whereby a libellant asks for some money stating his urgent need therefor. After some investigation, this libellant, having previously been paid $165, for maintenance and cure, was given an additional $500, upon signing the general release which thereupon expressed the consideration of $665.

Respondent now claims that this general release, in itself, ends all liability on the part of respondent and sets it up as a separate defense.

This libellant as a seaman occupies a peculiar position with the court. He is, what has been termed, a ward of the court. It is particularly interested in preventing any over-reaching conduct on the part of those who employed such seaman. There have been a number of decisions by the Circuit Court of Appeals of this Second Circuit in regard to such releases by seamen which should be and are followed by this court in coming to a decision. Each case, where a seaman is involved, depends upon the facts of that case.

As I read these decisions, such a release is valid provided it has been zealously scrutinized and the settlement thereupon found to be fair and just. The S. S. Standard (Bonici v. Standard, etc.), 2 Cir. 1939, 103 F.2d 437. While this case just cited covered damages for negligence as well as for maintenance and cure, the fact of the validity of a release in proper circumstances was approved.

The following year such a case appeared and the release was approved by summary judgment. Sitchon v. American Export Lines, Inc., 2 Cir., 1940, 113 F.2d 830.

The next year, summary judgment was held to be proper only in cases such as existed in the Bonici case supra. In other cases "there should be a trial of the issues, on evidence, at which the burden will be on the appellee to sustain the release 'as fairly made with and fully comprehended by the seaman'". Hume v. Moore-McCormack Lines, Inc., 2 Cir., 1941, 121 F.2d 336.

Thus this court has been informed of the proper manner in which to approach a question of validity of a release.

At the outset here, there has been a trial in which all the evidence has been pre-

sented. There has been found by this court no liability for negligence. There remains the question of maintenance and care, and aside from the performance of this duty towards the seaman as a fact the question whether the release is a valid one. I agree with the statement of the Circuit Court of Appeals that a proper settlement fairly entered into and fairly safeguarding the rights of the seaman is in the interest of seaman. Sitchon v. American Export Lines, Inc., supra.

Libellant impresses me as an intelligent and reasonably well educated man. As a witness some of his answers were not, in my opinion, truthful, but the release in question which he read and saw before he signed it prominently sets forth "Tuberculosis Pleurisy with Effusion." I am also satisfied that libellant in his months at the various hospitals was well aware that the doctors had found a tuberculous condition underlying the pleurisy which was the immediate illness developed by libellant on the voyage. I am satisfied that libellant well knew all this. The facts likewise show that this pleurisy had been cured and the tubercular condition reduced once more to the "static" condition existing before the seaman signed on, a condition where the sputum showed negative. At no time was this tubercular condition more than "minimal."

I am considering the facts at the time of the signing of the release, yet I am not unaware that libellant in his libel indicates knowledge that there was a tuberculous condition present, and in his examination by his expert this condition was found, with no proof whatever that would furnish a basis for a finding that this minimal tuberculosis was contracted on the ship because of any negligence on the part of the respondent.

This court has carefully examined the evidence to see whether this seaman reasonably and fairly knew what he was suffering from. It is not a case where some apparently unrelated physical illness developed thereafter which made a settlement hastily entered into because of need and without proper advice later appear plainly to be a harsh and unjust waiver of his rights to proper compensation for maintenance and care. While respondent claims that the amount paid in the settlement is more than libellant was then entitled to, I feel that the amount so paid was fair. Libellant, on the other hand, claims it should be more. In that situation the amount paid does not impress the court as being inadequate nor other than a fair settlement entered into knowingly and intentionally by libellant who himself fixed the amount with full knowledge of his illness and its possibilities. To do otherwise would place upon the respondent a burden of a continuing obligation lasting for an indefinite time, far beyond the time when libellant's physical condition had become static.

Accordingly, in my opinion, respondent has borne the burden of proof of showing that the release in question was fairly made and given by libellant and fully comprehended by him.

The release is sustained and the libel is dismissed without costs.

Submit findings of fact and conclusions of law.