**FARRELL v. UNITED STATES et al.**

No. 214, Docket 20917.

Circuit Court of Appeals, Second Circuit.

May 10, 1948.

G. Lester W. Curry, of New York City, for appellant.

John F. X. McGohey, U. S. Atty., and Burlingham, Veeder, Clark & Hupper, all of New York City (G. Hunter Merritt, of New York City, of counsel), for appellees.

Before L. HAND, AUGUSTUS N. HAND and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This appeal presents questions as to the duty of the master to warn a seaman in the Merchant Marine when granting him shore leave at a port partially destroyed during the war; the duty of the govern-

ment to provide a safe route to and from his ship within the area under its control; and the seaman's right to wages and maintenance and cure after being accidently injured within that area while attempting to return to his ship.

The appellant is a seaman who enlisted in the Merchant Marine on November 15, 1942. He was then twenty-two years old. After a training period, he was assigned to a ship by the War Shipping Administration and made one coast-wise voyage of seventeen days. He later shipped at New York on the S. S. Johns Hopkins and went to Naples, Italy. While there, on December 16, 1943, he signed on the S. S. James E. Haviland as a seaman with the grade of an oiler.

That ship, for which respondent Luckenbach Steamship Company was general agent and which the respondent United States owned and operated, docked at Palermo, Sicily on February 4, 1944. This port was then in the control of United States naval forces. It had been severely damaged during its capture from the enemy and, though some repairs had been made, was still in a damaged condition. Dim-out or blackout regulations were required for security, the invasion of Italy then being in progress. The port area was enclosed and kept guarded by sentries at each of five entrance gates. On February 5, 1944, the appellant applied for shore leave late in the afternoon and this was granted, he being given a pass by the master, good until 6 o'clock that evening. The master did not warn or instruct him as to any danger. He left the ship with three companions and went out of the guarded port area by Gate 5, which except for Gate 4, was the only entrance to that part of the port area where his ship was docked. He then spent some time sightseeing in Palermo during which he had some wine and then at about 8 o'clock he started with another seaman to return to his ship. It was raining and they became lost in the city but were finally directed to the port area by a local policeman and arrived at Gate 1, about a mile distant from the gate by which the appellant had left and which they were trying to find. They were admitted to the port area through Gate 1 upon presentation of their passes to the sentry on duty and soon became lost while trying to make their way to their ship, being unaware of the fact that they could do that only by going back into the city and going to Gate 4 or Gate 5. While walking along a muddy street in the semi-darkness they kept upon opposite sides in order both to be safe from approaching vehicles which would be running with dimmed or no lights and in the hope that they could obtain a ride to the dock where their ship was tied. While they were there walking some forty or fifty feet apart, the appellant's companion saw him fall over a railing and disappear. His companion went to his assistance and found that he had fallen into a graving dock which the navy was using for repairing ships. This dry dock was being used twenty-four hours a day and was surrounded by a chain strung thirty-six inches above the top of the sides of the dock and held there by steel posts. There were some lights in the area of the dock and enough lights on the floor of it to enable repair work to be done on a destroyer and a sub-chaser then in the dock. It was at least light enough for appellant's companion to be able to see him fall at a distance of forty or fifty feet.

The appellant was severely injured in the fall and as a result has become permanently blind and subject to recurring pain, especially in his head, and to epileptic attacks which may well become progressively worse as he grows older. He was given treatment in the naval hospital at Palermo and at other naval hospitals abroad and in this country until his condition had, before trial, improved as much as can be expected under medical care. Henceforth nothing can be done by further treatment except to alleviate temporarily whatever discomfort his condition may cause from time to time.

The appeal is from a final decree dismissing on the merits a cause of action under the Jones Act[1] and the Suits in Admiralty Act[2] and awarding wages plus bonus to the end of the voyage together

---

[1] 46 U.S.C.A. § 688.

[2] 46 U.S.C.A. § 745 et seq.

with $266 for medical care and medicines and $3.50 per day for maintenance during a period of six months, which was the time found to have been required to make his recovery as complete as possible, after he left the naval hospital in this country where he last was hospitalized.

There is ample support in the evidence for the findings above outlined and they in turn support the conclusion that neither of the respondents was negligent. The master was certainly under no obligation to deny shore leave to the appellant because the port of Palermo had previously been bombed and the destruction had not been repaired. He was on the contrary bound to give reasonable recognition to the seaman's right to shore leave when off duty. Aguilar v. Standard Oil Co. of New Jersey, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107. Nor was the master under any duty to warn the appellant that the dock area had been bombed, for that was obvious. Though much stress has been put upon the appellant's lack of experience as a seaman, there is nothing to show that he did not have the ordinary capacity of a young man of his age to realize that he was taking his leave on shore in a port partially destroyed and under limited illumination because of conditions resulting from the war and that he should govern himself accordingly. There is no proof that unusual danger in going to and from the ship by way of Gate 5 required special warning. And it cannot be said that the master was bound to foresee that the appellant might overstay his leave, lose his way, and reenter the port area at another gate a mile or so away from where he should have done so and unnecessarily subject himself to whatever danger was there. Thus it was not negligent to issue the pass and let the seaman take his leave without instructions.

It is argued that the respondent government was, because it was in control of the entire area, under the duty to maintain that area, which it permitted the appellant to enter while attempting to return to his ship, safe for that purpose.[3] But the findings sustain the conclusion that it was not negligent in that respect. These findings, which cannot be said to be clearly erroneous,[4] are that the dry dock did have a guard railing and that there was enough lighting in that area. While there was some conflicting testimony, several witnesses testified that the guard railing was put up immediately after a ship was docked and extended completely around the dock except at the water edge. One of these witnesses stated that the railing was up both a short time before and a short time after the accident. And the only eye-witness to the accident testified that the appellant fell over the chain. There was also much testimony to the effect that the area immediately surrounding the dry dock was kept lighted to a certain extent, despite the dimout or blackout in the city and the harbor area in general, since work was going on continually, night and day. The lighting consisted of flood lights around the edge of the dock directed towards the work going on in it, lights on some of the buildings in the dry dock area and on the ends of the booms of three cranes used in the repair work, and gangway lights on one of the vessels in the dock. Perhaps the lighting was insufficient on a dark and rainy night such as that of the accident to enable one to see everything in the area clearly, though the appellant's fall was seen from a distance of forty to fifty feet. But, it is to be remembered, this was war-time; Palermo was a base very near the actual theatre of operations. If dim-out or blackout regulations were required for the city itself, it could well have been thought necessary for the safety of all to keep lighting in the harbor area, perhaps the most likely target for bombing raids, to a minimum. Under these circumstances, we think that the government was not negli-

---

[3] See Marceau v. Great Lakes Transit Corp., 2 Cir., 146 F.2d 416, certiorari denied, 324 U.S. 872, 65 S.Ct. 1018, 89 L. Ed. 1426; O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596.

[4] As we have frequently stated, we will not disregard the findings of fact of the district court sitting in admiralty, unless they are "clearly erroneous." E. g., The Paul Dana v. Socony Vacuum Oil Co., 2 Cir., 165 F.2d 78; Petterson Lighterage & Towage Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992.

gent in failing to guard more adequately, by lights or otherwise, against the possibility of a fall into the dry dock by a seaman returning to his ship docked in another part of the harbor.

■ To allow the appellant his wages in full to the end of the voyage only instead of for a full year was also correct. The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760. The appellant signed on at Naples as a replacement while the original voyage was in progress. His shipping articles provided that: "It is agreed between the master and seamen * * * of the S. S. James E. Haviland * * * now bound from the Port of Philadelphia, to a point in the Atlantic Ocean to the eastward of Phila. and thence to such ports and places in any part of the world as the master may direct * * * and back to a final port of discharge in the United States, for a term of time not exceeding 12 (twelve) calendar months." The voyage was to end in the United States and did end there at the Port of New York on March 28, 1944. It seems clear that the agreement was for employment for the duration of the voyage only and not for twelve months, the clause "for a term of time not exceeding 12 (twelve) calendar months," serving to limit the period for which the appellant was employed, not to extend it beyond the end of the voyage. The Ipswich, D.C.D.Md., 46 F.2d 136. In Jones v. Waterman S. S. Co., 3 Cir., 155 F.2d 992, on which the appellant relies, the shipping articles covered one or more voyages as the master might direct within a limited term and is distinguishable on that ground. While in Shields v. United States, D.C.E.D.Pa., 73 F.Supp. 862, no notice seems to have been taken of this distinction, we think it decisive.

■ The allowance of bonus stands upon a different footing. The shipping articles contained a provision that "all decisions, amendments and attachments of the Maritime War Emergency Board shall apply to and become a part of this agreement." A decision of this Board on February 27, 1943 [5] provided that no bonus should be paid to a seaman while on land, making no exception in the case of one leaving his ship because of illness or injury. He was therefore correctly denied any bonus for the period while he was ashore.[6]

■ Appellant claims a right to maintenance and cure for life or "as long as the need continues." Generally speaking, however, the duty of the ship owner to provide maintenance and cure for the seaman "does not extend beyond the time when he is as completely cured as he ever can be." Lindgren v. Shepard S. S. Co., 2 Cir., 108 F.2d 806, 807; see Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 530, 58 S.Ct. 651, 82 L.Ed. 993; De Zon v. American President Lines, Ltd., 318 U.S. 660, 667, n. 3, 63 S.Ct. 814, 87 L.Ed. 1065. Appellant relies on a dictum in the Calmar case that as to "those cases where the incapacity is caused by the employment" different "considerations" might "be thought to require a more liberal application of the rule." 303 U.S. at page 530, 58 S.Ct. at page 654, 82 L.Ed. 993.

■ It is clear that, as we have held above, the appellant's injury was not caused by his employer's negligence. Perhaps, however, it was caused by his "employment," within the meaning of the Calmar dictum above noted. The appellant being on shore leave, in the process of returning to his ship, and on the employer's premises, the point seems arguable, it not being clear that the injuries were received as a result of intoxication or some other willful misbehavior. See Aguilar v. Standard Oil Co. of New Jersey, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107; O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596; Marceau v. Great Lakes Transit Corp., 2 Cir., 146 F.2d 416, certiorari denied, 324 U.S. 872, 65 S.Ct. 1018, 89 L.Ed. 1426. But this question we need not decide. It is sufficient to say here that, even if the appellant's injuries were "caused" by his "employment," we think the general rule applicable. Luksich v. Misetich, 9 Cir., 140

---

[5] Decision 2 A, art. VI-C(1) 8 Fed.Reg. 3461, 3462. Code Fed.Reg. (Supp.1943) 2138.

[6] The trial court awarded him his bonus during the time he was being repatriated and no appeal was taken from that part of the decree below.

F.2d 812, certiorari denied, 322 U.S. 761, 64 S.Ct. 1280, 88 L.Ed. 1589 (seaman's injury received as the result of a fall sustained in the course of his employment); cf. Lindgren v. Shepard S. S. Co., supra (seaman's service assumed to have aggravated a preexisting disease). Needless to point out, we also do not pass upon the case where the seaman's injuries are caused by the employer's fault or negligence.

In the Calmar case, at pages 531 and 532, of 303 U.S., page 655 of 58 S.Ct., 82 L.Ed. 993, it was said, however, that, "The seaman's recovery must therefore be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of the trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained." In this instance, it was found correctly that, "Libellant has been treated without expense to himself in various Government hospitals from February 5, 1944 until June 30, 1944 when he was discharged at Norfolk, Virginia, as completely disabled," and that, "Libellant has received the maximum cure that medical and surgical aid can accomplish." He was awarded what he had expended for medical treatment and medicines up to the date of the trial and in addition allowed maintenance to December 30, 1944 (six months after his discharge from the Norfolk hospital) as for the "reasonable period for maintenance during which maximum medical cure could be attained."

Were it not for the above quoted language in the Calmar case we would have no hesitancy in affirming the decree below. That language, however—in conjunction with the fact that the reversal of the decree was "without prejudice to any later suit by respondent to recover maintenance and cure to which he may then be entitled" —is conceivably susceptible to the interpretation that, though the seaman is as cured as he ever can be, he may still recover such amounts as are needed in a definitely ascertainable period in the immediate future to provide care of a clearly determinable kind. But if this interpretation were the correct one, the language would seem to be inconsistent with that on page 530 of 303 U.S., 58 S.Ct. 651, 82 L.Ed. 993 of the opinion stating in effect that the duty to provide maintenance and cure ends when the seaman is as completely cured as he ever can be. We take it, therefore, that, though Taylor, the seaman in the Calmar case, was afflicted with an "incurable malady," he was not at the time of the trial as cured as he could ever possibly be. Indeed, the Court said, "Care and treatment at frequent intervals, with periodic medical observation of the patient, are of aid in arresting its [the disease's] progress." Page 526 of 303 U.S., page 652 of 58 S.Ct., 82 L.Ed. 993. Moreover, as the Circuit Court of Appeals stated, 3 Cir., 92 F.2d 84, 87, the incurable disease from which Taylor suffered was "of a progressive nature" so that it could not be said that "the ordinary means which medical science affords for the treatment and care of this disease will be exhausted prior to his death." Here that is not the case. It was justifiably found that although the appellant will from time to time require some medical care to alleviate his attacks of headaches and epileptic convulsions, which may indeed become worse in the future, he has received the maximum cure that medical treatment and surgical aid may accomplish to forestall such future trouble.

Decree affirmed.