**Christos VASSOS, Plaintiff,**

v.

**SOC. TRANS-OCEANICA CANOPUS, S.A., Defendant.**

United States District Court
S. D. New York.

June 23, 1959.

Rehearing Denied Nov. 16, 1959.

Supplemental Opinion Jan. 4, 1960.

Jacob Rassner, New York City, for plaintiff.

Giallorenzi & Cichanowicz, New York City, for defendant; Victor S. Cichanowicz, New York City, of counsel.

DIMOCK, District Judge.

This is a suit to recover the cost of maintenance and cure. Plaintiff still has a case of arrested pulmonary tubercu-

losis. The existence of the disease was first discovered in January 1950. It was found to be arrested on or prior to January 9, 1953. There was a reactivation discovered in 1957. The disease has again been arrested. This state of facts raises difficult questions with respect to the application of the law of maintenance and cure in tuberculosis cases. The medical testimony in the case is to the effect that pulmonary tuberculosis is unpredictable, that there is always hope for a cure in a given case and that a case may be regarded as cured if there has been no reactivation within five years after it has been arrested.

Farrell v. United States, 336 U.S. 511, 517–518, 69 S.Ct. 707, 93 L.Ed. 850, announces the rule that the "shipowner is required to furnish medical care and maintenance, including board and lodging, until the disabled person has been cured or the disability has been declared permanent." The opinion does not treat of a disease such as pulmonary tuberculosis where, until the patient dies from some other cause, there is no way of telling surely whether he has been cured of tuberculosis. In the Farrell case the patient suffered post-traumatic convulsions which were without possibility of further cure yet the court seemingly left the way open for further recovery of maintenance and cure by saying, page 519, 69 S.Ct. page 711: "The Government does not contend that if Farrell receives future treatment of a curative nature he may not recover in a new proceeding the amount expended for such treatment and for maintenance while receiving it." I take this to mean that, if some new method of treatment were discovered which held out a hope of cure, the shipowner who had been liable for past maintenance and cure would be liable for this new treatment. I do not understand that if the patient's incurable illness has once been arrested the shipowner is liable for maintenance and cure in the event of a relapse. Indeed, the Court of Appeals, in Muruaga v. United States, 2 Cir., 172 F.2d 318, said at page 321, "[W]hen maintenance and cure has

brought about all the improvement to be expected in an incurable disease the shipowner's liability ends and thereafter the health of the seaman is at his own risk as far as the shipowner is concerned. If the seaman thereafter needs attention to maintain his improvement at the maximum, to assist him in recovery from relapses, or to restrain the progress of the disease, the shipowner is not bound to provide that. See Farrell v. United States, 2 Cir., 167 F.2d 781."

As these rules are stated, however, the termination of the shipowner's liability at the point of the arresting of the disease exists only in the case of an incurable malady. Is the rule different in a case like pulmonary tuberculosis which is unpredictable? My conclusion is that, for purposes of maintenance and cure claims, tuberculosis should be treated in precisely the same way as if it were a definitely incurable malady. In this I am supported by the case of Montilla v. United States, D.C.E.D.N.Y., 70 F.Supp. 181. There the court found that a seaman had been suffering from minimal tuberculosis when he shipped, that he had had an attack of pleurisy during the voyage which made his tubercular condition more acute, but that treatment had cured the pleurisy and had arrested the minimal tuberculosis. The court accordingly held that the limit of the period in which maintenance and cure should be provided had been reached.

The shipowner's liability for maintenance and cure depends not in the slightest degree upon fault. If a seaman falls sick in the service of the ship the shipowner is liable for maintenance and cure and that is the end of it. It would add intolerably to the burden of the shipowner if a seaman who was subject to a disease, like tuberculosis, which came in unpredictable recurrent outbreaks, could fasten upon the shipowner who happened to be his employer during, say, the third of these outbreaks liability for maintenance and cure with respect to the fourth and fifth, and so on for the rest of his life. The shipowner for whom the seaman worked at the time of each of the

succeeding outbreaks should be solely responsible for the maintenance and cure incident thereto.

With that statement of my conclusions as to the law the significance of the facts as I shall proceed to detail them will be more readily apparent.

Plaintiff is a native of Albania with the status of a permanent resident of the United States under section 6 of the Refugee Relief Act of 1953, 67 Stat. 403, amended by Public Law 751, § 3, 68 Stat. 1044–1045, 50 U.S.C. § 1971d. He had served as seaman before joining defendant's ship Canopus in February 1949. He had been found in good health when he underwent a physical examination on joining the S.S. Equator in December 1946 and upon about three subsequent physical examinations, the last one being in July 1948. He was given no physical examination when he joined the Canopus. Plaintiff says that he had an accident on the Canopus in May 1949 when some cases of supplies struck him on the chest. He was treated for pain in the chest by the captain and chief steward but it continued. He was discharged from the Canopus at Barry Docks, South Wales, on October 25, 1949 and repatriated to the United States at no expense to him. On November 9, 1949, he was paid off by the owner's agents and was referred to Dr. C. A. Bozes. Between that date and December 2, 1949, he underwent a series of examinations and tests which proved inconclusive. On December 2, 1949, he was admitted to the Medical Arts Center and underwent a further series of tests and examinations. These too appeared inconclusive and he was discharged on December 22, 1949. Due to the fact that a definite diagnosis had not been established Dr. Bozes referred plaintiff to Dr. Ornstein. On the basis of his examination Dr. Ornstein diagnosed plaintiff's ailment as a diaphragmatic hernia and recommended engaging a specialist, Dr. Sarot, for surgery. Dr. Sarot had plaintiff admitted to the Mt. Sinai Hospital on January 27, 1950 and there performed a left lower lobectomy. The operation revealed a wide-spread infection of tuberculosis although tuberculosis had up to that time been ruled out.

On March 8, 1950, plaintiff was discharged by the Mt. Sinai Hospital for further care at a sanatorium. Arrangements were made with the House of Rest at Sprain Ridge, Yonkers, New York, and plaintiff was admitted as a patient on March 28, 1950. At the House of Rest he was treated with streptomycin and penicillin, but his sputum was consistently positive of tuberculosis and, on April 7, 1952, he was taken from the House of Rest to the Doctors Hospital where a left thoractomy was performed and the disease was found to be so wide-spread that a left upper lobectomy was performed resulting in the complete removal of his left lung. He was discharged on April 22, 1952, to return to the House of Rest with the plan that he should come back to the Doctors Hospital for a space-filling thoracoplasty early in May. That operation was performed on May 12, and he was discharged on May 26, 1952, to return to the House of Rest.

After convalescence at the House of Rest plaintiff was discharged on January 9, 1953, with a discharge diagnosis classification of chronic pulmonary tuberculosis "arrested (nine months)". Apparently the nine months were counted from the date of the upper left lobectomy but, for purposes of maintenance and cure compensation, plaintiff certainly had not received maximum benefits of medical treatments when he still had thoracoplasty to go through with, so that for those purposes it cannot be said that the disease was arrested on April 7, 1952, when the upper left lobectomy was performed.

After plaintiff's operation and during his convalescence at the House of Rest the defendant sent Dr. George Simmons to examine him. After plaintiff's discharge from the House of Rest he, on his own account, consulted Dr. Simmons, the first visit taking place on February 3, 1953. Dr. Simmons treated him thereafter and is at present treating him.

Dr. Simmons, who testified on the trial, says that the disease was arrested at the time of plaintiff's discharge from the House of Rest on January 9, 1953. Sputum was negative and there was no other sign of tuberculosis. Nevertheless, the surgery had left him in a condition where he needed building up and he made twelve visits for this purpose to Dr. Simmons during the year 1953.

At the suggestion of one of the doctors at the House of Rest, plaintiff, on February 18, 1953, applied to the Altro Health and Rehabilitation Service with a view to becoming self-supporting again. He had been trained as a bookkeeper but, while he spoke English well from the standpoint of grammar, his accent was such that even before his illness he had had difficulting in making himself understood and in working as a bookkeeper. On April 6, 1953 he was admitted to the Altro Health and Rehabilitation Service and began training as a sewing machine operator with the thought that his language handicap would not affect him there. He was given on-the-job training at modest compensation. By June 5, 1953 he had been permitted to work for five hours a day. By January 12, 1954 he was permitted to work a full eight hour day. He never, however, actually put in more than 5¾ hours a day and, on the 1st of February, 1954, the supervisor reported that there had been no improvement in his work in the last five months. This was attributed to lack of interest and ambition rather than lack of ability. Despite this report he was on June 4, 1954, graduated from the Altro Health and Rehabilitation Service as having proved himself self-supporting and he obtained a position with an outside firm.

During 1954 Dr. Simmons had continued to treat him, plaintiff having visited him on six occasions. Another doctor who saw him during that year found that his disease was within an arrested stage.

Dr. Simmons testified that, considering the major surgery that plaintiff had undergone, it was not until two years after his discharge from the House of Rest, that is, not until January 13, 1955, that plaintiff would have been able to work full time at his trade of bookkeeper. He continued to visit Dr. Simmons during 1955, making four visits in that year. He was examined on June 13, 1955, by another doctor who found him 75% incapacitated and 100% incapacitated for heavy work, with a condition not likely to improve and which might get slightly worse.

During 1956 plaintiff called on Dr. Simmons on only two occasions, February 17 and May 16.

On April 24, 1957, plaintiff visited Dr. Simmons again and complained of a six months' old cough which had resulted in his raising blood on the day before. Dr. Simmons believed that the tuberculosis had been reactivated and treated him with drugs to kill the germs. Plaintiff improved. There is no present indication of active tuberculosis. Dr. Simmons prescribed a continuation of the regimen of germ-killing treatment until April 1959. He advised supervision for five years thereafter and said that if there had been no reactivation at the end of that period the patient could be regarded as cured. Dr. Simmons said that at the time when he was testifying plaintiff would be able to work as a bookkeeper.

■ I find that the pulmonary tuberculosis for which plaintiff was treated . at the House of Rest until January 13, 1953, had its inception while he was in the service of defendant as a seaman. I further find that maximum possible medical benefits had not been received until January 13, 1955, when he was first, as a result of rest after his operations, able to work full time at his trade of bookkeeper. I therefore find that he was entitled to receive maintenance and cure up to that date.

■ I further find that the disease was completely arrested at or before that date and that plaintiff is not entitled to maintenance and cure thereafter in connection with any reactivation of the disease in 1957, or otherwise.

Defendant has already paid $20,491.95 for medical expenses of plaintiff and ad-

vanced him $450. Counsel will please file memoranda in which they will translate this decision into dollars and cents so that I may determine the amount due from defendant in excess of the amounts already paid. I request that such memoranda be filed within ten days after the appearance of a notice of this decision in the New York Law Journal.

On Motion for Reargument.

As indicated in an opinion dated June 23, 1959, I found that plaintiff was entitled to maintenance and cure up to January 13, 1955. I asked the parties to file memoranda translating this decision into money and they have done so. In addition plaintiff has moved for reargument of my decision. That motion is hereby denied.

I find that plaintiff is entitled to maintenance at $6 a day. He is an alien seaman and defendant is an alien corporation. The parties stipulated that an alien seaman usually receives $6 a day from his alien employer. Moreover a rehabilitating organization found that his maintenance in this country required that sum and advanced enough to give him that much when his earnings were taken into consideration. It thus appears that he obtained maintenance for that amount.

Plaintiff was under the necessity of paying his own maintenance for 23 days from his repatriation on November 9, 1949, to December 2, 1949, when he was admitted to the Medical Arts Center; for 36 days between his discharge on December 22, 1949, and his admission to Mt. Sinai Hospital on January 27, 1950; for 20 days between his discharge on March 8, 1950, and his admission to the House of Rest on March 28, 1950 and for 729 days from his discharge on January 13, 1953, to his cure on January 13, 1955, or a total of 808 days.

At $6 a day total maintenance is $4,848. Plaintiff has been paid $450 leaving a balance of $4,398.

From this must be deducted his earnings. Perez v. Suwanee Steamship Co., 2 Cir., 239 F.2d 180. He earned $1,023 at the Boyle Leather Co. His earnings while being helped by the Altro Health and Rehabilitation Service have not been shown in detail but they may be estimated thus: it was found necessary to lend him $1,354.22 to eke out his earnings to permit him to live at the rate of $42 a week; he received assistance from the Service from April 10, 1953 to May 10, 1954, or 56 weeks; for 56 weeks he must have spent, at the rate of $42 a week, $2,352; the Service advanced of this $1,354.22, and he presumably earned the balance, or $997.78. This with his earnings of $1,023 at the Boyle Leather Co. amounts to $2,020.78 which must be deducted from the sum of $4,398 above found to be due leaving a balance of $2,377.22 to which he is entitled for maintenance.

Defendant has already paid $20,491.95 for medical expenses. The amounts sought by plaintiff except for such as were for the services of Dr. George Simmons and for medicines are expenses either for reports or for doctors while defendant was furnishing cure or incurred after cure had been accomplished. The liability for the repayment of $1,354 lent by the Rehabilitation Service does not represent an expense of cure and plaintiff will be put in funds for it out of the award for maintenance.

The bills for Dr. Simmons and for medicines have not been itemized as to date. Defendant offers to accept a bill from Dr. Simmons setting forth what his charges would be for the visits and any treatment rendered between February 3, 1953 when plaintiff first consulted him and January 13, 1955. Defendant has also expressed willingness to accept any competent evidence without the necessity of formal proof as to the cost of drugs from January 13, 1953 to January 13, 1955.

Plaintiff may submit to defendant's counsel within 15 days from the appearance of a note of this decision in the New York Law Journal the information suggested as to Dr. Simmons' bill and the bills for medicine and if the parties can agree upon the result it can be communicated to me by joint letter. Other-

wise the plaintiff will submit the material to me within fifteen days after its submission to defendant's counsel.

Judgment will be entered as soon as the undetermined amount of medical expenses has been fixed.

### Supplemental Opinion.

In a memorandum dated November 16, 1959, I found that plaintiff was entitled to $2,377.22 for maintenance and to the cost of treatment by Dr. Simmons between February 3, 1953 aud January 13, 1955 and the cost of drugs from January 13, 1953 to January 13, 1955.

I directed that plaintiff's counsel might submit the information as to these items to defendant's counsel and that if their amount was agreed upon judgment would be entered.

Plaintiff's counsel has submitted proof that the doctor's bill was $630 but has submitted no proof as to the amount spent for drugs.

Plaintiff's counsel seeks to introduce additional evidence as to plaintiff's earnings but that question is no longer open.

Judgment is directed for plaintiff in the sum of $3,007.22.

So ordered.