John C. STEWART

v.

WATERMAN STEAMSHIP CORPORA-TION and Alcoa Steamship Co., Inc.

Civ. A. No. 13834.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 31, 1968.

Raymond H. Kierr, J. Stuart Douglass, Kierr & Gainsburgh, New Orleans, La., for plaintiff.

Harry S. Redmon, Jr., A. Lynn Wright, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant Waterman Steamship Corp.

William E. Wright, Jr., Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for defendant Alcoa Steamship Co., Inc.

BOYLE, DISTRICT Judge:

This suit began as an action by John C. Stewart for damages brought under the Jones Act and the General Maritime Law, including the warranty of seaworthiness, as well as for maintenance and cure against Waterman Steamship Corporation (hereafter Waterman) and against Alcoa Steamship Co., Inc. (hereafter Alcoa) for maintenance and cure only. However, the morning of trial complainant abandoned his claim for damages under the Jones Act and General Maritime Law against Waterman, persisting only in his claim against both respondents for maintenance and cure. It was agreed between counsel for complainant and Waterman that the parties would bear their own costs relative to the dismissed damage claim.

The remaining claims were tried to the Court, which, after considering all the evidence and the briefs of counsel, rendered judgment in favor of both respondents and against complainant, dis-

missing the suit at complainant's cost. In connection with the judgment thus entered, the Court makes the following:

## FINDINGS OF FACT

1.

Respondent, Waterman, was the owner and operator of the S/S WILD RANGER and employed complainant to serve thereon as a boatswain from June 10, 1960 until at least September 14, 1960.

2.

Respondent, Alcoa, was the owner and operator of the S/S ALCOA PARTNER and employed complainant to serve thereon as a member of the deck department from December 16, 1960 until April 26, 1961.

3.

In 1945, complainant, then about eighteen years of age and a member of the U. S. Navy, was involved in a very serious automobile accident while on leave. As a result of this accident he sustained a fracture of the right side of the skull, requiring extensive surgery for the removal of a blood clot.

4.

Shortly after this automobile accident, complainant was honorably discharged from the U. S. Navy by reason of his head injury and was rated 100% disabled by the Veterans Administration. A few years later, however, complainant's disability rating by the Veterans Administration was reduced to 60% as complainant engaged increasingly in shoreside employment.

5.

In 1951, complainant commenced a career as a merchant seaman and made nearly 50 voyages prior to signing aboard Waterman's S/S WILD RANGER for a voyage commencing on June 10, 1960.

6.

During the post-accident months of 1945, complainant suffered bodily weakness and speech difficulty. Beginning in 1946 and continuing into 1960, complainant suffered from frequent dizzy spells and "black outs." About twice a year during this period he experienced "seizures" characterized by falling unconscious for periods as long as a half hour. During this same period, he would undergo "spells" during which he would feel "funny" and momentarily lose contact with his surroundings.

In 1956, complainant related a history to the Veterans Administration wherein he reported that he was told after certain seizures he had sustained that during said seizures he would "shake and shake." Prior to 1960, there were at least two occasions on which complainant was discovered by relatives in a sleep-like state. On both of these occasions complainant had been engaged in strenuous physical activity while exposed to unusual heat. The attacks or seizures were attributed to the heat.

7.

Complainant's medical records reveal that Dilantin, a seizure suppressing drug, had been prescribed for complainant as early as 1950, but that he rarely took it. The records also indicate that complainant's seizures usually followed periods of heavy alcoholic intake. There is no evidence that complainant's pre-1960 seizures were accompanied by tongue-biting, urinary incontinence, or foaming at the mouth.

8.

On September 12, 1960, while serving aboard the S/S WILD RANGER, complainant experienced a seizure during which he, apparently for the first time, bit his tongue and foamed at the mouth. Following this seizure he was taken to his berth. Two days later on September 14, 1960, complainant signed off, received his wages and was sent to a U. S. Public Health Service Hospital in New York. Complainant, having been classified as not fit for duty, left the New York hospital that same day, bound for the Veterans Administration Hospital in New Orleans, Louisiana, where he was admitted on September 20, 1960 and remained through September 27, 1960.

When he was discharged from hospitalization on September 27, 1960, his condition was diagnosed as "grand mal seizures, secondary to old trauma to the head" and he was placed on a prescription of Dilantin.

10.

Respondent, Waterman, paid complainant's travel expenses, subsistence, and wages for September 15 and 16 and maintenance for September 17, 18 and 19.

11.

Complainant, perhaps under the impression that his discharge from the Veterans Administration Hospital in New Orleans, Louisiana on September 27, 1960 with a prescription for Dilantin erased the unfit for duty status accorded him by the U. S. Public Health Service Hospital in New York on September 14, 1960, signed aboard the S/S ALCOA PARTNER on December 16, 1960, made two consecutive voyages thereon, and signed off on April 26, 1961.

12.

During his course of service aboard the S/S ALCOA PARTNER, complainant suffered several seizures. The record is silent regarding the type or severity of these seizures. However, before complainant signed off the S/S ALCOA PARTNER the United States Coast Guard stripped him of his seaman's papers, which have not since been reissued.

13.

On May 3, 1961, complainant, cognizant of the fact that without a fit for duty declaration he could never regain his Coast Guard papers, entered the U. S. Public Health Service Hospital in New Orleans, Louisiana, seeking an evaluation of his duty status with the hope of regaining his seaman's papers. There is no evidence that from the time complainant left the S/S ALCOA PARTNER until the time he entered the hospital on May 3, 1961 that he experienced any seizures or other discomfort. After undergoing twelve days of tests,

he was discharged from the hospital on May 15, 1961, classified as permanently not fit for sea duty, at which time he was advised to take Dilantin regularly and avoid alcoholic intake.

14.

The evidence concerning complainant's medical condition for the period from mid-1961 until the date of trial is indefinite and in some instances conflicting. However, a preponderance of the evidence indicates that complainant experienced no seizures during the year following his discharge from the U. S. Public Health Service Hospital at New Orleans, Louisiana. Thereafter, he has undergone periods of severe and frequent seizures as well as periods of infrequent and mild seizures. This variation in the frequency and severity of seizures is to some extent typical of grand mal epilepsy and was, in complainant's case, perhaps related to the fidelity with which he took his medication and abstained from alcoholic intake.

15.

Two expert medical witnesses testified at the trial, one called by the complainant and the other by the respondents. In all important aspects their testimony was harmonious. The expert medical evidence establishes that post-traumatic epilepsy is a condition arising from scarring in the brain, which scarring gives rise to a neurological phenomenon in certain cells of the brain resulting in seizures. Seizures can be of several types, namely, grand mal, psychomotor, and petit mal or "absence." The grand mal seizure is generally the most severe. During a grand mal seizure the victim loses consciousness and falls prostrate, accompanied at times by various other manifestations including frothing at the mouth, tongue-biting, fecal and urinary incontinence, difficulty in breathing, tonic muscular state, and convulsive shaking. The more of these symptoms which occur during the grand mal seizure, the more severe the grand mal seizure is considered. However, since loss of consciousness is the basic manifestation of the grand mal seizure, the ab-

sence of any or all of the other possible symptoms does not mean such a seizure is of other than the grand mal type. The psychomotor seizure is typified by stereotyped abnormal movements, behavioral disturbances, and loss of contact with one's surroundings, all while the victim is ostensibly conscious. The petit mal or "absence" seizure is typified by a brief loss of contact with one's surroundings, sometimes lasting only seconds. It is not unusual for an epileptic to experience at different times different types of seizures, as well as seizures of the same type, but of varying severity.

Post-traumatic grand mal epilepsy, from which complainant suffers, is incurable. Control of seizures is not a cure, for the precipitative factor, the scarring, remains. The testimony establishes that no drug would, with any probability, permanently eliminate complainant's seizures. Surgery is beneficial principally in cases involving psychomotor epilepsy, with which complainant is apparently not afflicted. Hence, complainant is dependent upon drug therapy for the control of his seizures. Dilantin is now and has for quite some time been the "drug of choice" in the control of grand mal epileptic seizures. Dilantin has been available to and prescribed for complainant since at least 1950.

██ One of the doctors testified that in his opinion complainant was a grand mal epileptic as early as 1956. The same conclusion, though not explicitly expressed, is the only logical one which could be drawn from the testimony of the other doctor. We find that complainant was a grand mal epileptic both before, during and after his employments aboard the S/S WILD RANGER and the S/S ALCOA PARTNER.

The prognosis is that complainant, as an incurable grand mal epileptic, will always to a greater or lesser extent suffer from seizures. Although the degree of seizure control may, and probably will, be increased by experimentation over a period of years with various anti-convulsant drugs, it is far beyond the realm of probability that his seizures can be totally eliminated.

16.

The evidence fails to establish whether or not, when complainant left the S/S WILD RANGER on September 14, 1960 and received his wages, the amount he received included wages until the end of the voyage. Indeed, the date on which the voyage actually terminated is unclear. Although complainant, himself, contends the voyage ended on September 18, 1960, relying on an answer to a questionnaire filed by respondent, Waterman, with its insurer, the log book of the S/S WILD RANGER suggests an even later date. Furthermore, the evidence fails to reveal what the daily wage of complainant was when he was in Waterman's employ aboard the S/S WILD RANGER. Consequently, the record does not permit a finding of fact with respect to what amount, if any, Waterman may owe complainant for wages to the end of the voyage.

## CONCLUSIONS OF LAW

1.

This Court has jurisdiction of the cause and venue is properly laid in the Eastern District of Louisiana.

2.

██ The vessel and its owner owe the seaman who is injured or falls ill while in the service of the ship maintenance and cure, as well as wages to the end of the voyage.[1]

3.

██ The duty to provide wages, maintenance and cure arises from the

---

1. The OSCEOLA, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); Calmar S.S. Corporation v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); Aquilar v. Standard Oil Co., of New Jersey, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). See also The Law of Seamen, Norris, Vol. 1, Sections 537 and 542.

contract of employment and is dependent neither upon the fault of the shipowner nor upon a causal relationship of the injury or illness to the employment. Maintenance consists of food and lodging comparable to that to which the seaman is entitled while at sea. Cure "is care including nursing and medical attention * * *." [2]

### 4.

■ The shipowner's duty to provide maintenance and cure continues until such time as the ill or injured seaman is cured or his condition is declared permanent.[3] Thus, "the shipowner is liable for maintenance and cure until the illness, ailment, disease or condition is cured or recognized as being incurable."[4] This is the rule even where treatment is required to alleviate pain or to restrain further degeneration.[5]

### 5.

■ Notwithstanding the fact that the shipowner's duty to provide maintenance and cure is quite broad, the seaman, nonetheless, bears the burden of alleging and proving facts entitling him to be included within its scope.[6] In order to carry this burden, the seaman must show, among other things, that his illness or injury occurred, was aggravated or manifested itself while he was in the service of his ship.[7] Consequently, the

fact that a seaman's injury or illness preexisted the voyage does not necessarily preclude the recovery of maintenance and cure.[8]

### 6.

There is authority of dubious current vitality that the illness for which the seaman seeks maintenance and cure must have had its inception while he was in the service of the ship.[9]

### 7.

If the "manifestation" of an illness sustained by a seaman must be the initial manifestation of said illness in order to qualify the seaman for maintenance and cure, then complainant is entitled to no recovery since his illness, post-traumatic grand mal epilepsy, antedated his service aboard the vessels involved.

### 8.

■ However, even if the view be adopted that any manifestation of a pre-existing illness of a seaman while in the service of his ship entitles him to maintenance and cure, complainant is, nonetheless, entitled to no recovery. Complainant's condition is incurable. Any treatment he may receive will be palliative and not curative in nature. Future drug therapy may reduce the frequency and severity of his seizures,

2. Calmar S.S. Corporation v. Taylor, supra. See also The Law of Seamen, Norris, Vol. 1, Section 543.

3. Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949).

4. The Law of Seamen, Norris, Vol. 1, Section 561, page 633 citing cases. See Fernandez v. United Fruit Company, 287 F.2d 447 (5th Cir., 1961).

5. Travis v. Motor Vessel RAPIDS CITIES, 315 F.2d 805 (8th Cir., 1963). See also Maritime Injury and Death, Edelman, Vol. 1, page 14 and the cases there cited.

6. Prendis v. Central Gulf S.S. Co., 330 F.2d 893 (4th Cir., 1963).

7. The Law of Seamen, Norris, Vol. 1, Section 556, page 618 and the cases cited thereon in footnote 7.

8. McCorpen v. Central Gulf S.S. Corporation, 396 F.2d 547 (5th Cir., May 16, 1968); Dragich v. Strika, 309 F.2d 161, 3 A.L.R.3d 1077 (9th Cir., 1962). See also the annotation appearing at 3 A.L.R. 3d 1082 et seq.

9. Miller v. Lykes Bros.-Ripley S.S. Co., Inc., 98 F.2d 185 (5th Cir., 1938) wherein the Court stated, "The claim for maintenance has no basis in the absence of a showing that the polycythemia began while appellant was in the service of the Ethan Allen, and not at an earlier time as found by the court." See also Erotokritos v. Velousios, 104 F.2d 761 (5th Cir., 1939); Capurro v. The ALL AMERICA, 106 F.Supp. 693 (E.D.N.Y., 1952).

but will never totally eradicate them. Even were we to treat each grand mal seizure as a separate manifestation of a pre-existing condition, complainant would be entitled to maintenance and cure only until he had reached maximum possible cure with respect to each seizure. The record fails to show that there were any side effects of any of his shipboard seizures which required any medical attention after he left the U. S. Public Health Service Hospital or the vessel aboard which the seizure occurred as the case may be. The result might be otherwise if after each shipboard seizure the seaman had been left with serious aftereffects requiring medical treatment to restore him to his pre-seizure condition.[10]

### 9.

It would be manifestly unjust to require a shipowner to provide future maintenance and cure to a seaman who came aboard his vessel a grand mal epileptic and left the vessel a grand mal epileptic simply because that seaman happened to experience one or more seizures aboard that vessel, and indeed leaves in no worse condition than when he signed on. To hold the shipowner to such an obligation would be to make the shipowner an unqualified insurer and grant the seaman a pension, both of which are outside the scope of the doctrine of maintenance and cure.[11]

### 10.

■ The shipowner is not subjected to an indefinitely continuing obligation to furnish medical care to a seaman afflicted with an incurable disease, which manifests itself during his employment, but is not caused by it.[12]

### 11.

■ The circumstances here presented preclude the application of those cases which involve aggravation of pre-existing latent conditions, as well as those involving the flareup of previously arrested incurable illnesses. Consequently, the failure of complainant to show that he became a grand mal epileptic while serving aboard respondents' vessels, his failure to show that future drug therapy will be other than palliative, and, finally, his failure to show that he had reached less than maximum possible recovery from his seizure aboard the S/S WILD RANGER by the date of his discharge from the U. S. Public Health Service Hospital in New York and from his seizures aboard the S/S ALCOA PARTNER by the date he finally signed off that vessel amount to a failure on the part of complainant to prove such facts as would entitle him to maintenance and cure in any amount.

### 12.

■ Similarly, complainant has failed to establish those facts upon which the Court could base an award of wages to the end of the voyage against respondent, Waterman. Indeed, without knowing through what date complainant received wages and without knowing what complainant's daily wages were, any award of wages would have to be grounded on pure speculation.

### 13.

The Court does not reach respondents' defense that complainant is not entitled to maintenance and cure as a consequence of his concealment or non-disclosure of his pre-existing epileptic condition in view of the result reached on other grounds.

### 14.

Respondents should have judgment dismissing this action at complainant's costs.

10. Vassos v. Soc. Trans-Oceanica Canopus, S.A., 205 F.Supp. 845 (S.D.N.Y., 1959).

11. Farrell v. United States, supra; Monroe v. Farrell Lines, Inc., 1965 A.M.C. 2703 (Peo.Ct.Balt.Md., 1965).

12. Calmar S.S. Corporation v. Taylor, supra.