Worthy SIDERS, Jr., Plaintiff,

v.

The OHIO RIVER COMPANY, Defendant.

Civ. A. No. 69–608.

United States District Court, W. D. Pennsylvania.

Oct. 23, 1970.

On Motion for New Trial April 12, 1971.

---

Hymen Schlesinger, Pittsburgh, Pa., for plaintiff.

Anthony J. Polito, of Rose, Schmidt & Dixon, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, Chief Judge:

Worthy Siders, Jr., plaintiff herein, filed the above action for maintenance and cure which is claimed to have arisen out of an accident sustained by the plaintiff on board the defendant Ohio River Company's M/V Fiore on or about August 25, 1967. On motion of the plaintiff, this case was consolidated with a similar claim for maintenance and cure filed by the plaintiff against Downey Towing Company at Civil Action No. 67–1329, which claim allegedly arose out of an accident on Downey's vessel on or about November 20, 1962. This court has jurisdiction of the cause and venue is properly laid in the Western District of Pennsylvania.

The consolidated actions were tried to the court. A considerable amount of testimony was taken at the trial concerning the occurrences of the two accidents and surrounding circumstances, and plaintiff's life history and conduct both before and after the accidents. The claim against Downey was compromised and settled after the trial; however, some of the facts brought out pertaining to that claim are believed relevant to the instant claim and will be referred to herein.

It is the opinion of the court that plaintiff is not entitled to recover maintenance and cure from The Ohio River Company.

Suffice it to say, in light of the record, the plaintiff experienced a very abnormal and disruptive childhood. His parents were divorced when he was one year old, and he lived for various peri-

ods with his grandparents, uncles, father and stepmother. He completed nine grades of education in eleven years of schooling. He has never served in the armed forces because he failed the Selective Service I. Q. test. He did pass the physical examination, however, and this was after the Downey accident of November, 1962, after his stay at Detroit Hospital, and after 13 months incarceration at the prison at Moundsville, West Virginia, ending with the summer of 1964.

Plaintiff had always wanted to be a "river man". He was successful in getting his first job on the river at about the age of 16, "learning how to be a deckhand". However, he was relieved of his position when he failed to report for work when called. Being out of school and unemployed, he spent his time "going to the pool halls and show, or movie or else running around" for about a year.

In May of 1962, he applied for and obtained employment with Downey Towing Company, where he worked until November of that year. On or about November 20, 1962, plaintiff sustained an accident while in the employ of Downey, working as a deckhand on the M/V Peggy Downey. This accident occurred when plaintiff was carrying a pipe fitting and he slipped and fell on some oil on the deck. Plaintiff sustained an injury to his back and, thereafter, was treated by Dr. Eshanaur, plaintiff's family doctor, and Dr. W. Lewis Brown of the United States Public Health Service (USPHS) in Gallipolis, Ohio. Plaintiff states that he first hurt the lower part of his back and shortly after that his whole back began bothering him and he "began having nerve trouble and headaches and dizzyness [sic]" (PX–1).

Plaintiff continued to see Dr. Brown with the same complaints. The medication which was prescribed for him apparently was of no benefit, and on January 18, 1963, he was given a letter of transferal to the USPHS Hospital in Detroit, Michigan. Plaintiff reported to the USPHS Hospital in Detroit on February 25, 1963, and was an inpatient there until March 20, 1963, when he voluntarily eloped (PX–1, PX–2). Plaintiff's diagnosis at the Detroit Hospital was "lumbosacral strain" and "dental caries" (PX–1, PX–2). Besides his back pain, he also complained of vertigo-like symptoms, blurred vision and dizziness. (Consultation Sheet, PX–2). His main course of treatment while in the hospital was for his dental problem. He left the hospital against doctor's advice. He felt that he was not receiving proper treatment for his back.

Downey had been making maintenance payments to plaintiff after the accident, but when he voluntarily left the hospital in March, the payments were stopped.

Following his stay in the hospital, the plaintiff got into some trouble with the law while he was intoxicated. He was imprisoned in Moundsville (W.Va.) State Penitentiary for the alleged offense, but in the summer of 1964, he was granted a "full unconditioned pardon from the Governor of West Virginia" (Tr., p. 291) and was released from prison and his record cleared.

Following his release from prison, the plaintiff did not return to work for about five months because he was enjoying his freedom, and he also wanted to do something for his back that was still bothering him. He finally started back to work near the end of 1964, and for the next two years he worked for a number of different employers (approximately eight) never staying at the same job for any great length of time. He testified that he was not "able to hold a job. I was just unable to work due to my condition and I had nervous trouble and I was—after a while I couldn't get along with people. I just had to more or less move on." (Tr., p. 43.)

During this period of time, one of plaintiff's employers was the Zubik Towing Company (referred to in the transcript as "Sumick"). While employed by Zubik, he broke his finger,

and later negotiated a small cash settlement with Zubik for this injury.

In January of 1967, plaintiff filled out and signed an "APPLICATION FOR EMPLOYMENT" form with Ohio River Company (DX–B), and in so doing, certified that the answers on the form given by him were "true and complete". It appears, however, as was brought out in cross examination, that plaintiff deliberately and intentionally made several material misrepresentations of fact on said application form, to-wit:

(1) He denied having any disabilities or handicaps, even though he admitted at trial that his ability to work as a deckhand was seriously impaired as a result of the Downey accident in November, 1962;

(2) he denied having lost any time from work for the two-year period prior to his making application (January, 1967), even though he admitted at trial that following his release from prison in the summer of 1964 until his employment with the defendant in 1967, his employment was sporadic and he could not work steady;

(3) he denied ever having suffered from any occupational disease or injury, even though he admitted at trial that he had sustained an occupational injury while working for Downey in November, 1962, and another injury while working for Zubik; and

(4) he denied ever having filed a claim or receiving a settlement for an occupational disease or injury, even though he admitted at trial that he had received a cash settlement from Zubik for the occupational injury he sustained while working there.

Two months later, on March 1, 1967, plaintiff received a pre-employment physical examination. During the course of said examination, he deliberately and intentionally made additional material misrepresentations of fact to the defendant's examining physician, to-wit:

(1) He denied ever having any prior injuries, either minor or serious, even though he admitted at trial the two accidents previously mentioned (Downey and Zubik);

(2) He specifically denied having had any prior "back trouble" or "nervous disorder", even though he admitted at trial that he had had problems with his back since the Downey accident and with his nerves following his hospitalization in Detroit (DX–C);

(3) he denied ever having any disease or condition not specifically asked by the physician, even though he admitted at trial that he had experienced such conditions as dizziness and headaches following the 1962 accident and his hospitalization; and

(4) he also denied ever having been a patient in any hospital, even though he admitted at trial that he had been an inpatient at the USPHS Hospital for approximately three weeks in 1963.

Taking the plaintiff at his word: He filled out the application and answered the questions in such a way that would help him get the job; he did not think he would get the job if he told the truth about his prior accidents and his physical condition.

Plaintiff was hired by the defendant and started working as a deckhand on March 20, 1967. During the next five months he worked on board the defendant's vessels for a period of 62 days, was off on accumulated leave time a period of 58 days, and was off for a period of 39 days due to lack of work.

On August 21, 1967, plaintiff reported on board defendant's M/V Fiore at South Chesire, Ohio. Plaintiff claims he was injured on the M/V Fiore in the morning of August 25, 1967. He claims that the crew was on the deck, and that they had been rearranging the tow, when the watchman or the mate told them to place the lockline. It is plaintiff's testimony that he asked the other deckhand to help him with the line because it was a "good sized line". However, the other deckhand was talking and ignored his request for help, and when he tried to pick it up himself, he

"slipped while picking it up and * * * [he] felt something pulling in * * * [his] neck and shoulder". Plaintiff then states that "I had gotten off watch after that and I began hurting in my chest awful bad and I was actually scared." When he got off watch, plaintiff talked to the other deckhand to see what he should do. He was advised to go see a doctor, so he woke up the captain and arrangements were made to get him to the hospital at Owensboro, Kentucky.

The plaintiff could not remember at trial exactly what he told the captain and deckhand, i. e., whether he told them he hurt himself while lifting the lockline or whether he merely told them he was not feeling good and was hurting and wanted to see a doctor.

The plaintiff was accompanied from the boat to the hospital by the "day man", but he could not remember whether he told the "day man" that he hurt himself on the boat or was just hurting in the chest.

Charles Counts was the other deckhand on the afterwatch with plaintiff at the time of the alleged accident. Contrary to the plaintiff's version, however, Counts stated that he did not hear the mate or anyone give plaintiff orders in his presence to carry a lockline, and further, that there was never any occasion on the boat to carry a lockline. Counts could not recall ever observing plaintiff carrying a lockline or being asked by the plaintiff to help carry a lockline. During the afterwatch (12:00 midnight to 6:00 A.M.) on August 25th, plaintiff did tell Counts that he was sick in his stomach and asked what to do; that he said he thought he was sick and had to get off the boat or see a doctor. Plaintiff then went to the pilot house and asked the pilot what he should do.

Walter Holt was the utility man or "day man" aboard the M/V Fiore who accompanied the plaintiff to the hospital in Owensboro, Kentucky, on the morning of August 25, 1967. On the way to the hospital, plaintiff told him that he was sick in his stomach and that he was sort of sick when he first got on the boat. At no time did the plaintiff report an accident to Holt.

Howard Gifford was the pilot of the M/V Fiore and was in the pilot house during the afterwatch on August 25, 1967. The plaintiff came to the pilot house between 1:00 A.M. and 2:00 A.M. and stated that he felt sick at his stomach and thought he might have to get off the boat. Gifford told the plaintiff to let him know if he wanted off so that arrangements could be made. Shortly thereafter, the plaintiff returned to the pilot house and said his stomach was no better and he would have to get off the boat. Arrangements were then made for the plaintiff to get off at Owensboro and go to the hospital there.

Plaintiff was at the Owensboro Hospital for only one hour, and part of that time was waiting to see the doctor. The examining physician's diagnosis was "myositis". However, no treatment was administered and the plaintiff was sent home. No history was recorded, and plaintiff does not recall whether he told the doctor about any accident. The record (PX-3) reveals the following notation: "c/o [complains of] feeling bad, dizzy and pains thru left side of chest."

Plaintiff returned home, and on August 28, 1967, he saw Dr. Gibert at the USPHS out-patient office in Gallipolis, Ohio. The record of that office reveals that on that date plaintiff requested a chest x-ray "because he feels worn out. He has felt this way since 5-1967. X-ray of the chest made at the Holzer Hospital was negative." (PX-1.) The next day, August 29th, he again saw Dr. Gibert complaining of pain in his left shoulder and chest. He was given a prescription and told he could return to work on September 2nd or 5th depending on how he felt. There was no mention of an injury (PX-1), and plaintiff could not remember what he told Dr. Gibert.

During the first week of September, 1967, Mr. Cunningham, the defendant's

personnel manager, contacted plaintiff by phone and asked him to return to work. Plaintiff replied he was ready to go back to work. He made no comments about his physical condition or complaints. Plaintiff did not report back to work, and after subsequent unsuccessful attempts to contact him, his employment status was terminated in November, 1967.

On October 13, 1967, plaintiff retained legal counsel (PX–7). On October 24, 1967, he reported back to Dr. Gibert, and on this, the third visit, he mentioned an injury. However, "he was very indefinite as to the date of his injury and how he hurt his shoulder" (PX–1). (His previous complaint with respect to this accident concerned his chest and stomach, not his shoulder.) He reported again to Dr. Gibert on October 28, 1967, and this time inquired about psychiatric examination. He was told that he could be sent to Detroit for such services (PX–1).

Plaintiff did not return to Gallipolis USPHS Hospital until March 19, 1968. On this occasion he was advised that his Health Service eligibility had expired and that he must obtain written proof that he had received treatment since he last saw. Dr. Brown (USPHS) in November, 1967 (DX–D).

On June 11, 1968, plaintiff voluntarily entered Lakin State Hospital as an inpatient. After only a week, however, he eloped (PX–4). Prior to his elopement, a medical examination revealed that physically he was "within normal limits", and it was noted, "patient expresses numerous hypochondrical complaints —back, heart, etc." (PX–4). A neurological examination was reported "negative". A tentative diagnosis presented on June 17, 1968 was "schizophrenic reaction, paranoid type" (PX–4). An x-ray of the chest taken June 11, 1968 was "normal" (PX–4). On June 13, 1968, plaintiff gave a history of neck, back and chest pain, and also dizzy spells, nerve trouble and headaches (Contact Report, PX–4). He left after a week because they were only giving him "medicine * * * for * * * [his] nerves" and he wanted "to try to get medication and help someplace else" for his other ailments.

Since August 25, 1967, plaintiff has been employed as a deckhand by at least three employers; he was employed on one occasion to help erect Christmas decorations, and on another to cut weeds. However, plaintiff has never been able to hold a steady job. He also has problems in communicating and getting along with people.

Plaintiff's complaints have not in any way subsided. Indeed, from his testimony at trial his complaints were more magnified than in the past. His complaints and symptoms at trial included his neck, his entire back (upper, middle and lower), his chest and shoulder, dizzy spells, headaches, nerve troubles, and trouble with his eyes.

The tentative diagnosis of Dr. Gonzalez of the Lakin State Hospital was "schizophrenic reaction, paranoid type", and this was concurred in by practically all the doctors who testified. The seeds of his mental illness were probably sown in his abnormal childhood, but did not come to noticeable fruition until after he was hurt on November 20, 1962. It is possible that this mental disease is responsible for his continued complaints of pain in his back, neck, chest and shoulder, and dizziness, blurry vision, headaches and nervous condition. Stated another way, his mental disease is possibly responsible for his hypochondriasis.

■■ Maintenance and cure is compensation of a contractual form given by general maritime law to a seaman who becomes sick or is injured while in the service of his vessel. This obligation on the part of the shipowner is deep-rooted in maritime law and is an implied term of the contract for maritime employment. McCorpen v. Central Gulf Steamship Corporation, 396 F.2d 547 (5th Cir. 1968). Although the shipowner's duty to provide maintenance and cure is broad, the seaman still bears the burden of alleging and proving facts bringing

him within its scope. Prendis v. Central Gulf Steamship Company, 330 F.2d 893 (4th Cir. 1963). This burden requires a showing that the illness or injury occurred, was aggravated or manifested itself while the seaman was in the service of the ship. Stewart v. Waterman Steamship Corporation, 288 F.Supp. 629 (E.D.La.1968); Norris, The Law of Seamen, Vol. 1, § 556.

The plaintiff contends that he is entitled to maintenance and cure for re-injury of his back allegedly sustained on the defendant's ship and also that "his psychiatric condition was aggravated or precipitated to the point of disability" (plaintiff's "Brief for Plaintiff on Claim for Maintenance and Cure", p. 7). It is our opinion that his contentions are not supported by a fair preponderance of the evidence.

First of all, regarding the alleged physical injuries, the plaintiff did not sustain his burden of proving that he sustained an injury of any kind on August 25, 1967. No one was told of the alleged accident until almost two months later and after he had engaged legal counsel. The crew members, to whom the plaintiff talked and asked for help, who he alleged were witnesses to the accident and who would be expected to corroborate his testimony, did not do so. In this regard, we concur in an observation so well stated by Judge Willson of this court:

> "In this regard my experience as a trial judge in trying many FELA and Jones Act cases is that crewmembers will generally support one another when the issue arises as to whether a brother employee was hurt or whether a report was made of an injury received by one of them. I find this is so even in respect to conductors in charge of trains and captains in charge of vessels. They do not hesitate to confirm an injury or at least the report of an injury because it is of no consequence to them one way or another." Walker v. Ohio River Company (Adm. No. 64–5, unreported opinion dated February 2, 1965).

The plaintiff complained of stomach trouble as his excuse to get off the boat. The report of the USPHS Out-Patient Hospital in Gallipolis (PX–1) shows that after the alleged accident, he saw Dr. Gibert four times. However, it was not until the third visit that he mentioned anything to Dr. Gibert about an accident, and this was nearly two months after the alleged accident. On his fourth and last visit, he inquired about a psychiatric examination and was told he could be sent to Detroit, but he was not seen again. When his employer, the defendant, called him to come back to work the following September, he did not mention the alleged injuries. From all these facts, we find that the plaintiff did not suffer a traumatic injury on board the defendant's ship, and that he did not become mentally ill or physically ill in any substantial way while in the service of defendant's ship.

With regard to the plaintiff's long-standing mental problem, we think that it may form the basis of his numerous subjective complaints. He has offered no real proof as to precisely what his mental condition was when he was in the defendant's employment. He does not contend that he left the ship because of his mental problem, but rather plaintiff contends that this problem was aggravated at the time or some time after he left the ship. The Lakin State Hospital made only a tentative diagnosis of "schizophrenic reaction"; the defendant's doctor testified that the plaintiff suffered from schizophrenia and had the disease in November of 1962, and probably prior to that time.

The question, therefore, is whether the defective functioning of plaintiff's mental and emotional equipment was caused, aggravated or manifested itself while the plaintiff was in the service of the ship. There is no real proof that plaintiff's condition now, both mentally and physically, is any different from what it was before the voyage, or, indeed, before he was hired by the defendant. We find his mental condition was not caused, aggravated, nor

did it manifest itself while plaintiff was in the service of the defendant's ship.

Moreover, even if it be assumed that plaintiff sustained a physical injury to his neck, back, shoulder and chest, and his mental condition and nervousness became manifested or was aggravated, he is precluded from recovery by his wilful misrepresentations and concealment of the facts concerning his prior injuries and prior nervous condition at the pre-employment examination and interview. McCorpen v. Central Gulf Steamship Corporation, *supra*; Evans v. Blidberg Rothchild Company, 382 F.2d 637 (4th Cir. 1967); Burkert v. Weyerhaeuser Steamship Company, 350 F.2d 826 (9th Cir. 1965); *Cf.* Gore v. Clearwater Shipping Corporation, 378 F.2d 584 (3d Cir. 1967).

Judgment will be entered in favor of the defendant. This opinion shall be deemed to embody findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P., 28 U.S.C.A.

An appropriate order will be entered.

### MEMORANDUM AND ORDER

#### On Motion for New Trial

After non-jury trial on the issue of maintenance and cure, the court entered judgment in favor of the defendant. The plaintiff filed motions for a new trial and to alter or amend the judgment. Rules 59 and 52(b), Fed.R.Civ.P. We think the motions should be denied.

In support of his motions, the plaintiff alleges that the court's findings, conclusions and judgment are contrary to the law, the evidence, and the weight of the evidence. The plaintiff failed to prove his claim for maintenance and cure by a fair preponderance of the credible evidence. On the other hand, the defendant proved by the weight of the credible evidence that the plaintiff did not sustain a physical injury on board its ship; it further proved that plaintiff's long-standing mental condition was not aggravated by anything which occurred on board; nor did his mental disease manifest itself by any unusual or bizarre conduct while he was in the service of the ship. The court is still of the opinion that the mental disease which afflicted the plaintiff long before he was hired by the defendant, and which was in remission and not known to anyone connected with the defendant, prior to or during his employment, does not entitle him to an award for maintenance and cure.

In addition, plaintiff complains that the findings "may have destroyed his Jones Act case", which he had separately filed at Civil Action No. 68–176, D.C., 351 F.Supp. 995. Without deciding that issue, such a complaint is hardly a legal reason to alter the findings in the maintenance and cure action. After all, it was the plaintiff who requested that his maintenance and cure action be severed from his Jones Act claim, so as to permit an expedited trial of the former.[1] We do not think that he is entitled to another day in court before a jury to meet his burden of proving his maintenance and cure claim, but on that issue must abide the result of the non-jury trial which he sought.

The plaintiff further assigns as error the court's findings that he made certain wilful misrepresentations of material facts prior to his employment by defendant which also precluded him from recovery. These findings and conclusion were an alternative basis (strongly urged by counsel for the defendant) upon which the claim for maintenance would have been denied even though the plaintiff had sustained his burden of proving that he had been disabled in the service of the ship. In our opinion these findings and the conclusion should not be amended.

An appropriate order will be entered.

1. See: Plaintiff's "Motion for Hearing on Maintenance and Cure" filed October 29, 1969; the pretrial order of December 15, 1969, at page 3 of the transcript of the pretrial conference; and the Order of Court filed December 16, 1969, fixing a time for hearing.